[Cite as *Wade v. Mancuso*, 2018-Ohio-1563.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

MICHELLE D. WADE,
ADMINISTRATOR OF THE ESTATE OF
NICOLE M. WADE, DECEASED

      Appellant

      v.

KAHLA D. MANCUSO
aka KAHLA D. YANDURA

      Appellee

C.A. No.     16CA010978

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    14CV185137

DECISION AND JOURNAL ENTRY

Dated: April 23, 2018

---

CARR, Judge.

{¶1} Plaintiff-Appellant Michelle D. Wade, as the Administrator of the Estate of Nicola Wade, deceased ("the Estate"), appeals the judgment of the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} On January 9, 2013, around 6 p.m., Defendant-Appellee Kahla Mancuso, aka Yandura, left the grocery store and headed home via Cooper Foster Park Road. In that area, Cooper Foster Park Road is a two-lane, 35 m.p.h., road, with a narrow paved shoulder and an approximately three-foot wide unimproved shoulder. Mancuso was driving east in a 1991 GMC van. At the same time, Nicola Wade ("Wade") was also walking east along Cooper Foster Park Road with her back to traffic. Tragically, Mancuso did not see Wade and Mancuso's vehicle struck Wade. Wade died shortly after the collision.

**{¶3}** In December 2014, the Estate filed a complaint alleging that Mancuso negligently operated her vehicle off the roadway, struck Wade, and proximately caused her injury and death.[1] Prior to trial, in February 2016, the Estate moved to exclude the testimony of Mancuso's forensic toxicology expert, Dr. Alfred Staubus, who was to testify about the levels of any drugs or alcohol in Wade's system and the effect they would have had on her. The Estate objected on the basis that his testimony was not relevant. In May 2016, the trial court issued an order granting in part and denying in part the Estate's motion; Dr. Staubus was prohibited from discussing any use of cocaine by Wade but was otherwise permitted to testify.

**{¶4}** In June 2016, the matter proceeded to a jury trial. During trial, the survivorship claim was dismissed. Ultimately, the jury was faced with competing versions of the evidence. The Estate presented evidence that Wade was walking on the shoulder and that Mancuso's vehicle left the roadway and hit Wade while Wade was on the shoulder. However, Mancuso presented evidence that Wade was in the road when Mancuso's vehicle struck Wade.

**{¶5}** During the middle of trial, the Estate filed a motion in limine seeking to exclude the testimony of Dr. Staubus based upon what it asserted was a new development. The Estate argued that Dr. Staubus's conclusion that Wade was in the euphoria stage of alcohol influence was based upon inadmissible evidence. The Estate pointed out that, since the trial court had overruled the prior motion in part, a witness had died. The Estate argued that Dr. Staubus relied on the statement of that witness in concluding that Wade was in a euphoria stage of alcohol influence and that, due to the death of the witness, that statement would be inadmissible hearsay which Dr. Staubus could not rely on. In addition, the Estate asserted that Dr. Staubus improperly

---

[1] A substantially similar amended complaint was filed that same day.

relied upon his opinion that it was common sense to not walk with traffic in concluding Wade was in the euphoria stage even though Wade's actions did not violate the law.

{¶6} That day, the trial court drafted a written order overruling the Estate's motion on the basis that it was untimely. The trial court did not view the death of the witness as a new development, noting that the witness had died in March and the Estate did not file the motion until June. During the trial, the trial court recited its written order and additionally noted that, through the Estate's admission of certain dash cam videos, statements of the deceased witness were admitted into evidence and thus the trial court concluded there was no prejudice in the admission of Dr. Staubus's testimony. Prior to Dr. Staubus's testimony, the Estate again objected to the testimony based in part upon Dr. Staubus's reliance on the statement of the deceased witness. The trial court overruled the objection.

{¶7} The jury returned a verdict for Mancuso. In so doing, the jury completed an interrogatory finding that Mancuso was not negligent in the operation of her vehicle.

{¶8} The Estate has appealed, raising three assignments of error for our review, which we will address out of sequence to facilitate our analysis.

II.

**ASSIGNMENT OF ERROR III**

THE JURY'S FINDING THAT APPELLEE WAS NOT NEGLIGENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶9} The Estate argues in its third assignment of error that the jury's finding that Mancuso was not negligent is against the manifest weight of the evidence because the weight of the evidence supports that the collision occurred off the road.

{¶10} "When an appellant challenges the weight of the evidence in a civil case, this Court weighs the evidence and all reasonable inferences, considers the credibility of witnesses

and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Internal quotations and citations omitted.) *Lubanovich v. McGlocklin*, 9th Dist. Medina No. 14CA0081-M, 2015-Ohio-4618, ¶ 5.

{¶11} In order to prevail on a claim for wrongful death, the plaintiff must prove: "(1) a wrongful act, neglect, or default of the defendant that proximately caused the death and that would have entitled the decedent to maintain an action and recover damages if death had not ensued; (2) the decedent was survived by a spouse, children, parents, or other next of kin; and (3) the survivors suffered damages by reasons of the wrongful death." *Cline v. Stein,* 9th Dist. Wayne No. 13CA0052, 2015-Ohio-2979, ¶ 30, quoting *McDowell v. DeCarlo*, 9th Dist. Summit No. 23376, 2007-Ohio-1262, ¶ 34.

{¶12} The trial court instructed the jury that the Estate claimed that Mancuso "negligently failed to drive within a single marked lane of traffic which proximately caused the death of Nicola Wade." The trial court went on to provide that, before the jury could find for the Estate, the jury must find: "[1.] Nicola Wade was walking on the shoulder along the roadway; and [2.] Defendant Mancuso operated her vehicle and failed to drive entirely within a single marked lane of traffic by moving her vehicle onto the shoulder; and [3.] the negligence of Defendant Mancuso proximately caused the death of Nicola Wade." The jury rendered a general verdict for Mancuso and completed an interrogatory finding that Mancuso was not negligent in the operation of her vehicle.

{¶13} There was no dispute at trial that Mancuso's vehicle struck Wade and that Wade died from her resulting injuries. Instead, the dispute centered on where the accident occurred. Competing versions of events were presented to the jury. The Estate presented evidence that

would support the conclusion that Wade was hit while she was on the shoulder of the road; however, Mancuso presented evidence that would support the conclusion that, at the time of the collision, Wade was in the road and Mancuso's vehicle only left the road following the collision.

{¶14} The Estate's witnesses included police officers with training in traffic crash investigation, an employee from a cell phone company, and an expert in accident reconstruction. Mancuso presented the testimony of Dr. Staubus, herself, and a traffic crash reconstructionist.

{¶15} During the testimony of the police officers, the Estate played dash cam videos for the jury, which were also admitted into evidence. Those videos depict the scene of the accident shortly after the collision. In the area of the crash, the road is a two-lane asphalt road with a shoulder but no sidewalks. The stretch of road contained an approximately one-foot wide paved shoulder and an approximately three-foot wide unimproved shoulder. The north side of the street is in Lorain and the south side of the street is in Amherst. The collision occurred on the south side of the street in the City of Amherst. The videos included images and statements from Mancuso. Mancuso appeared distraught and at one point admitted fault. She reported that Wade came out of nowhere and that Mancuso did not even have time to hit the brakes. Mancuso also stated that she was on the road the whole time. Mancuso denied being on the phone at the time of the accident and relayed that it was not her practice to answer the phone when she was driving. However, audio from one of the videos reflects Mancuso telling someone that she was placing a call as she was pulling on to Cooper Foster Park Road but she hung up. One video also included statements from a woman, who was later identified as a witness. Those statements indicate that Wade was walking in the middle of the road when Mancuso hit Wade.

{¶16} Mancuso testified in her own defense. She testified that on the night of the accident, she drove to the grocery store in her husband's parents' van. On her way home, she

turned on to Cooper Foster Park Road and was driving at approximately the speed limit, which was 35 m.p.h. She had her low beam headlights on. She denied using the phone between the time she left the grocery store and the time of the accident; however, a call did come in during the drive, but she did not answer it. Mancuso denied that her vehicle left the road prior the accident and indicated that she did not see Wade prior to the collision. Once Mancuso realized she had hit something, she went off the road to the right, reentered the road, and pulled over. She then grabbed her phone and jumped out of the van. Mancuso acknowledged making calls prior to dialing 911 and explained that she was having difficulty using her phone. Mancuso admitted that, in the dash cam video, she stated that she used the phone when she left the grocery store; however, she indicated that she did not remember making the statement and denied making any calls before the accident. Mancuso testified that she did not sharply swerve her van to the left following the collision and thus disputed the police opinions about the tire tracks demonstrating a sharp turn onto the road.

{¶17} Officer Kyle Gelenius with the Lorain Police Department was called to Cooper Foster Park Road on the evening of January 9, 2013, to investigate the traffic accident. At the time of the collision, Officer Gelenius had completed the first two of four levels of training in traffic crash investigation. He investigated the accident with Officer Ricardo Soto, who had completed all four levels of training; thus, he was considered a traffic collision reconstructionist. Officer Gelenius and Officer Soto concluded that Mancuso was driving east on Cooper Foster Park Road and Wade was also walking east with her back to traffic on the soft shoulder. Mancuso then traveled off the right side of the road onto the shoulder and struck Wade. Wade was thrown into the grassy area on the south side of the road. The officers believed Mancuso

swerved the vehicle left after the impact with Wade, traveled left of center, and then traveled back into the eastbound lane. The vehicle came to rest with the right tire on the shoulder.

{¶18} Officers used various pieces of physical evidence to form their opinions. That evidence included Wade's white winter hat which was found on the soft shoulder. Based on their training, the officers determined that the location of impact would have been in the general area of the hat. Based upon that information, the officers determined that Wade was thrown approximately 55 feet. West of the hat, also in the shoulder, officers found muddy tire tracks that matched Mancuso's vehicle's tracks, which continued east past the hat, onto the road and then proceeded left of center for a short distance. That evidence led the officers to conclude that Mancuso drove off the road, struck Wade, and then traveled onto the road. Additionally, Officer Gelenius noted that there was no debris in the roadway until east of the location of the first muddy tire track; thus, the officers did not believe the crash occurred before the location of the muddy tire track. Further west of the crash location, officers noticed boot prints in the soft shoulder that matched Wade's boot prints. Those boot prints continued east in a consistent path in the shoulder towards the driveway of a business up to the area of the mailbox of the business, which was east of the driveway. The hat was found a sizeable distance east of the mailbox. Unfortunately, the shoulder in the immediate area east of the mailbox was contaminated due to all the traffic from rescue and police vehicles. Thus, boot prints were not noted in that area.

{¶19} At the scene of the accident, Mancuso provided officers with her iPhone and the passcode to it. Police then subpoenaed the cell phone records from Mancuso's carrier. A representative from the carrier produced a call log from the time of the accident at trial. The records reveal that Mancuso called 911 at 6:06 p.m. on the night of the crash. Prior to the 911 call, also at 6:06 p.m., the records reflect that Mancuso's number called two numbers but the

calls lasted mere seconds. At 6:05 p.m. Mancuso's number placed another call that lasted 12 seconds and at 6:03 p.m. a call to her number went to voicemail.

{¶20} Lyn Jackman, an accident reconstructionist with a Bachelor of Science degree in civil engineering, testified as an expert on behalf of the Estate. From the record, it appears she presented a diagram to the jury; however, that diagram was not admitted and is not a part of our record. Jackman ultimately concluded that the impact occurred in the area of the mailbox of the business and that it happened off the road in the shoulder area. She based her conclusion on boot prints that were determined to be Wade's which started some distance west of the mailbox and continued east in the shoulder. Jackman noted that the last documented print was in the area of the mailbox and that there could have been additional prints to the east but, because the area east of the mailbox was contaminated, no prints were found. No boot prints were documented in the road. Jackman observed that police documented areas of debris in between the last boot print and the first muddy tire track of Mancuso's vehicle which was off the road. Jackman opined that there would not be debris if the accident had not already happened. Further, debris would not appear behind the site of the accident.

{¶21} Jackman noted that Mancuso's vehicle continued in the shoulder for approximately 55 to 58 feet, as evidenced by the muddy tire tracks, before veering onto the road, overcorrecting, and then stopping. Jackman believed that this distance corresponded to Mancuso's perception-reaction time. Jackman defined perception-reaction time as the lag between when an event happens and the time it takes a person to react to that occurrence. Jackman averred that that time was one to one and one half seconds. During that time, the person would continue in the same manner as the person had just prior to the occurrence. Jackman opined that Mancuso did not see Wade before hitting her and that the distance Mancuso

traveled on the shoulder following impact was the amount of time it took her to realize she had hit something and react.

{¶22} Dr. Staubus, a forensic toxicologist, detailed the results of Wade's and Mancuso's toxicology results. No drugs or alcohol was found in Mancuso's system. Wade's testing revealed clonazepam (a benzodiazepine), a metabolite of clonazepam, and alcohol. Dr. Staubus testified that the level of the clonazepam was within a therapeutic range and thus, would indicate that Wade was taking the medication as prescribed. In his opinion, Wade's ingestion of clonazepam did not have an impact on the crash. The testing could not confirm whether there was marijuana in Wade's system due to some form of interference.

{¶23} Wade's blood alcohol level was .038 grams per deciliter. Relying upon a chart titled the "stages of acute alcoholic influence[/]intoxication in non-tolerant individuals[,]" Dr. Staubus indicated that, based upon the results, Wade would qualify as being in either the sobriety or euphoria stage. The sobriety stage ranged from .01 to .05 grams per deciliter and the euphoria stage ranged from .03 to .12 grams per deciliter. Which stage the person would be in would depend on the person's alcohol tolerance. Dr. Staubus noted that, in the euphoria stage, the person would be more sociable, more talkative, have decreased inhibitions, reduction in attention, judgment, and control. Dr. Staubus concluded that Wade was in the euphoria stage and that the alcohol in her system did have some impairing effects. As evidence that Wade was in the euphoria stage, Dr. Staubus cited Wade walking with traffic and also the statement of an eyewitness, which he read, which indicated that Wade was walking in and out of the road, which gave the witness the impression that Wade was impaired. Thus, his opinion was that, based upon Wade's behavior, she was in the euphoria stage, as opposed to the sobriety stage.

{¶24} On cross-examination, the Estate pointed out that the autopsy report indicated that Wade was a chronic alcoholic. Based upon that, Dr. Staubus agreed that that could mean that Wade had a higher tolerance for alcohol, but that would depend on Wade's recent drinking habits. Dr. Staubus, based on the witness statement and Wade's behavior, nonetheless maintained that he believed that Wade was in the euphoria stage.

{¶25} Henry Lipian, a traffic crash reconstructionist, testified on behalf of Mancuso. Lipian was involved with accident reconstruction in the United States Coast Guard and in the Ohio State Highway Patrol. Lipian also taught accident reconstruction and, unlike Jackman, was certified by the Accreditation Commission of Traffic Accident Reconstructionists. Lipian was trained in forensic mapping, which utilizes surveying equipment to map and measure crash locations, which he used in evaluating this crash. Lipian averred that forensic mapping allows for more detail and accuracy, as compared to the traditional mapping, which was used by the Estate's witnesses.

{¶26} Lipian presented a PowerPoint presentation to the jury to discuss his relevant findings and conclusions with the jury. While there is extensive testimony in the record discussing the presentation, the presentation itself is not in our record, nor was it admitted into evidence as an exhibit. In his presentation, Lipian discussed three different phases of perception: the point of first possible perception, actual perception, and evasive action. The first phase occurs when a reasonably alert motorist would first begin to recognize a hazard. The second phase occurs when the person recognizes that there is a problem, and the third phase is the point at which the person responds to the problem.

{¶27} Lipian testified that at the time of the crash, it would have been dark out and the artificial lighting from businesses would not have been sufficient to illuminate a pedestrian. He

noted that, while there were overhead lights in the area, they were not at the crash location. Additionally, Lipian pointed out that Wade was wearing dark-colored clothing and boots and a white hat.

{¶28} Based on the specifications of the van and Wade's height and weight, Lipian determined that the impact would have occurred above Wade's center of mass, which would mean that her body would be thrown forward. Lipian calculated that Wade would have been thrown approximately 75 feet. Lipian concluded that the throw distance of 55 feet, determined by the police, and based upon the location of the hat, was too short. He noted that there was debris that was located behind, or to the west of, the hat, and he saw no mechanism which would allow the debris to move backwards. Thus, the location of the debris indicated to him that the impact occurred further west of the hat. Additionally, he observed that, if the impact occurred at the location of the hat, it would be impossible for Mancuso to have had time to maneuver the van to the left, back into the lane, and then stop, when the van was traveling about 35 m.p.h. He pointed out that the van would also not have the capability to engage in that type of maneuvering in that short of a distance. Thus, Lipian discounted the evidence of the swerve as being associated with this crash, but still agreed that the van did drive off the road and on the shoulder for a short distance.

{¶29} Based upon the location of the debris, Lipian concluded that the likely point of impact was near the driveway or mailbox of the business. He observed that, while there were boot prints found to the west of the driveway of the business, the absence of boot prints at the area of impact led him to believe that Wade was likely on the pavement at the time of the impact. Additionally, he pointed out that, if the impact had occurred on the soft shoulder, he would expect to find a scuff mark where the pedestrian began to be propelled forward by the impact and

no such mark was documented. Thus, he opined that Wade was on the roadway at the time of the collision and that the van did not leave the road until after the impact. Lipian averred that Wade was somewhere between the fog line and two feet on to the road at the time of impact.

{¶30} Lipian also conducted an experiment to determine when a motorist would observe a pedestrian in the roadway under similar conditions. He utilized similar-aged drivers, a similar vehicle, and he himself, given his similar height to Wade, acted as the pedestrian. The drivers knew they were part of an experiment but were not told what the target object was or where they might see it. The drivers were instructed that, when they observed a hazard, they should apply the brakes and stop. Lipian factored into his calculations the fact that the drivers were looking for a hazard because Mancuso would have had no such warning. Based on the experiment, Lipian determined that Mancuso would have begun to perceive the hazard at 75 to 80 feet away but that that would not have been enough time to avoid hitting Wade. Lipian pointed out that Mancuso's vehicle would have been traveling 51.31 feet per second and that it likely would have taken her 2.2 seconds to perceive and react to Wade being in the road. Thus, Mancuso's vehicle would have gone 112 feet by the time she was able to react to Wade being in the road. Lipian further determined that, even if Mancuso could begin to perceive Wade at the outer limits of the capability of her headlights, which was at a distance of 90 feet, and if Mancuso's reaction time was only 2 seconds, Mancuso still would not have been able to avoid the accident. Lipian asserted that Jackman's projected perception-response time of one to 1.5 seconds was too short given the conditions.

{¶31} Lipian acknowledged that Mancuso's phone activity could potentially change his opinion but he would need more information about her phone activity. Lipian observed that someone could get a call, answer, and not be distracted. Lipian also noted that some cell phones

are capable of voice dialing, which would mean the person would not have to dial anything irrespective of whether the vehicle had Bluetooth capabilities. Lipian clarified that in order for phone use to be a distraction it had to interfere with the person's normal ability to perceive, react, and take evasive action.

{¶32} After a thorough and independent review of the record, we cannot say that the jury lost its way in finding Mancuso not negligent. The jury was presented with competing views of the evidence. While there certainly was evidence to support that Wade was in the shoulder at the time of the collision and that Mancuso drove off the road prior to striking Wade, there also was substantial evidence that Wade was in the roadway when she was hit and that Mancuso did not drive off the road until after the impact. This included evidence from the dash cam video and testimony from Mancuso. Additionally, Mancuso's expert gave detailed and thorough testimony explaining how he came to the conclusion that Wade was hit while she was on the road.

{¶33} The Estate points to the fact that Mancuso's trial testimony, indicating that she did not make a call when she was driving, conflicted with the statements she made in the dash cam video on the night of the accident. The Estate believes that, given the timing of the calls on the log, the evidence supports that Mancuso was on the phone at the time of the collision, which the Estate believes supports its theory that that distraction caused her to drive off the road and hit Wade. However, even if the jury believed that Mancuso did make a call while she was driving, that did not require the jury to conclude that Mancuso was negligent or that she was on the phone at the time of the collision. Moreover, even if the jury believed that Mancuso was on the phone at the time of the collision, the jury could have reasonably concluded that the collision occurred because Wade was in the roadway and not because Mancuso was a distracted driver who drove

off the road. Ultimately, "[i]n reaching its verdict, the jury was in the best position to evaluate the credibility of the witnesses and it was entitled to believe all, part, or none of the testimony of each witness." *State v. Lane*, 9th Dist. Summit No. 28438, 2017-Ohio-8050, ¶ 11, citing *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35.

**{¶34}** The Estate also focuses on the location of the boot prints and tire tracks in the shoulder in arguing that the jury lost its way. The Estate asserts that there was no physical evidence to support that the crash occurred on the road, noting that there were no boot prints on the road and there were tire tracks and boot prints on the shoulder. However, Lipian's testimony relied on, and explained the physical evidence, but used that evidence to support his opinion that the accident did occur on the road. Lipian's testimony does not ignore either the boot prints or the tire tracks on the shoulder. In fact, even the Estate acknowledges in its brief that Lipian's opinion "did not directly run afoul of the physical evidence[.]" Here, the jury was faced with competing versions of the evidence and charged with determining which witnesses were more credible. We also remain mindful that the jury viewed a diagram presented by Jackman and a PowerPoint presentation from Lipian which were not admitted into evidence and are accordingly not before this Court. Thus, the jury also considered evidence that we cannot review. "[T]his Court will not overturn the [jury's] verdict on a manifest weight of the evidence challenge simply because the [jury] chose to believe certain witnesses' testimony over the testimony of others." (Internal quotations and citations omitted.) *Magnum Steel & Trading, LLC v. Mink*, 9th Dist. Summit Nos. 26127, 26231, 2013-Ohio-2431, ¶ 29. The Estate has failed to demonstrate that the jury's verdict created a manifest miscarriage of justice. *See Lubanovich,* 2015-Ohio-4618, at ¶ 5.

**{¶35}** The Estate's third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY ADMITTING THE TESTIMONY OF DR. ALFRED STAUBUS.

{¶36} The Estate argues in its first assignment of error that the trial court erred in admitting Dr. Staubus's testimony. Specifically, the Estate asserts that Dr. Staubus impermissibly based his testimony on facts that were not in evidence, namely, the statement of the deceased witness, in violation of Evid.R. 703. Additionally, the Estate argues that Dr. Staubus was not qualified to conclude that Wade was walking the wrong direction by walking with traffic, and thus his testimony violated Evid.R. 702(B). Finally, the Estate argues that even if the testimony satisfied the criteria in Evid.R. 702 and 703, the testimony concerning Wade's alcohol consumption or possible impairment was irrelevant.

{¶37} "[T]he admission or exclusion of expert testimony 'is within the discretion of the trial court[, and] [s]uch decisions will not be disturbed absent abuse of discretion.'" *McMichael v. Akron Gen. Med. Ctr.*, 9th Dist. Summit No. 28333, 2017-Ohio-7594, ¶ 41, quoting *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9. An abuse of discretion implies that a trial court was unreasonable, arbitrary or unconscionable in its judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶38} The Estate's arguments concerning Dr. Staubus' reliance on the statement of the deceased witness and Dr. Staubus' ability to testify concerning the correct way of pedestrian travel on or near a roadway were first raised in the Estate's motion in limine filed during the trial. The Estate's previous motion in limine only asserted that Dr. Staubus's testimony was not relevant. As noted above, in ruling on the motion made during the trial, the trial court found the motion untimely and denied it on that basis. The trial court additionally noted that statements of the deceased witness were admitted into evidence by the Estate via dash cam videos. While the

Estate again raised the issue of Dr. Staubus's reliance on the statement of the deceased witness prior to his testimony, the trial court again overruled it without specifying a basis.

{¶39} On appeal, the Estate has not argued that the trial court abused its discretion in denying the motion in limine based upon it being untimely. In fact, the Estate has not developed any argument addressing the trial court's ruling or why this Court should presume that the denial of the objection prior to Dr. Staubus's testimony was based on anything other than the trial court's prior ruling finding the motion untimely. *See* App.R. 16(A)(7). Further, it is not this Court's duty to create an argument for the Estate demonstrating that that ruling was an abuse of discretion. *See Lathan v. Andrews*, 9th Dist. Summit No. 28382, 2017-Ohio-4419, ¶ 15. Accordingly, the Estate has not demonstrated the trial court abused its discretion. To the extent the Estate has challenged the trial court's admission of Dr. Staubus's testimony based upon arguments made in the motion the trial court found untimely, we overrule the Estate's arguments.

{¶40} The Estate has also asserted that Dr. Staubus's testimony concerning Wade's alcohol consumption or possible impairment was irrelevant. The Estate filed a timely motion in limine to exclude Dr. Staubus's testimony on this basis. However, the Estate has not pointed to any instance in the transcript where the Estate renewed its objection to Dr. Staubus's testimony on the basis of relevancy. *See* Evid.R. 103(A)(1). After briefing closed in this matter, Evid.R. 103 was amended to provide that, "[o]nce the court rules definitely on the record, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Evid.R. 1102(S) states that the amendments to Evid.R. 103 "govern * * * all further proceedings in actions then pending, except to the extent that their application in a particular action pending when the amendments take effect would not be feasible or would work injustice, in which event the former procedure applies."

{¶41} Assuming without deciding that the current version of Evid.R. 103(A) applies to this matter, and that the trial court's ruling on the motion in limine was definitive, we cannot conclude that the trial court abused its discretion in denying the Estate's motion based upon relevancy.

{¶42} Evid.R. 401 provides that relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 403(A) states that, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶43} The Estate argues that the only relevant evidence was evidence that "shows how and why Mancuso's van hit and killed Wade[]" and contends that Wade's blood alcohol level was irrelevant to that determination. In so doing, the Estate focuses only on the evidence that Mancuso went off the road and struck Wade and ignores the evidence from Mancuso's accident reconstruction expert that Wade was on the road at the time of collision. Testimony concerning Wade's blood alcohol level could provide support to the theory that Wade was walking on the road.

{¶44} Additionally, the Estate, in its argument, fails to acknowledge that Mancuso presented the affirmative defense of comparative negligence. The Estate has not explained why Wade's blood alcohol level would be irrelevant to Mancuso's affirmative defense or why, if it was relevant to the affirmative defense, the probative value of the evidence would be substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). "To prove the affirmative defense of contributory

negligence, the defendant must prove that the plaintiff breached a duty, proximately causing her own injury. Thus, the plaintiff's own 'want of ordinary care * * * [must have] combined and concurred with the defendant's negligence and contributed to the injury as a proximate cause thereof, and as an element without which the injury would not have occurred.'" *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, ¶ 61, quoting *Brinkmoeller v. Wilson*, 41 Ohio St.2d 223, 226 (1975). There is case law that supports the conclusion that blood alcohol level can be relevant to a comparative negligence determination. *See Clark v. Curnutte,* 9th Dist. Lorain No. 05CA08732, 2006-Ohio-1545, ¶ 7, quoting *Am. Select. Ins. Co. v. Sunnycalb*, 12th Dist. Warren No. CA2005-02-018, 2005-Ohio-6275, ¶ 7, citing *Bishop v. Munson Transp.*, 109 Ohio App.3d 573, 578 (7th Dist.1996) ("A blood-alcohol test result is relevant to the issue of comparative negligence."). And while we have concluded that expert testimony is necessary to explain the significance of the results in order to avoid unfair prejudice, confusion of the issues, or misleading the jury, here the results were presented along with expert testimony. *See Clark* at ¶ 10. Accordingly, the Estate has failed to convince us that the evidence was irrelevant or unfairly prejudicial under the circumstances before us. Thus, the Estate has not demonstrated that the trial court abused its discretion in admitting the testimony.

**{¶45}** The Estate's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY NOT ALLOWING APPELLANT TO DISCUSS DURING VOIR DIRE THE LOCATION AND DIRECTION OF WHERE A PEDESTRIAN IS LEGALLY ALLOWED TO WALK IN RELATION TO THE ROADWAY.

**{¶46}** The Estate argues in its second assignment of error that the trial court erred in limiting voir dire. Specifically, the Estate maintains that it should have been able "to discuss the

particular hypothetical of a pedestrian walking on the shoulder in the same direction of traffic and then whether the prospective juror still felt that is wrong" to do so even if it was legal to do so.

**{¶47}** Determining the scope of questions posed in voir dire "is a matter wholly for the trial court to determine in the exercise of its sound discretion and in the light of all the facts and surrounding circumstances." *See Dowd-Feder, Inc. v. Truesdell,* 130 Ohio St. 530, 535 (1936).

**{¶48}** The transcript reflects that the Estate spent a fair amount of time discerning the jurors' beliefs on where pedestrians should walk in relation to the road. In light of the some of the prospective jurors' belief that a pedestrian should walk facing traffic, the Estate sought to present the prospective jurors with the law concerning pedestrians and where they should walk and then question whether the jurors would follow the law. Over objection, the trial court declined to allow the questioning, noting that the particular points of law would be covered in the jury instructions. Nonetheless, the Estate was then permitted to ask whether if the law was different from what the jurors' opinions of what the law was would the jurors still be able to follow the law. The prospective jurors responded that they could follow the law.

**{¶49}** Under these circumstances, we fail to see how the Estate's voir dire examination was unreasonably limited. The crux of what the Estate sought to investigate was whether the prospective jurors could follow the law if the law differed from their beliefs or opinions. The Estate was able to pursue that line of inquiry and the prospective jurors indicated that they could follow the law. *See Akron v. Detwiler,* 9th Dist. Summit No. 14385, 1990 Ohio App. LEXIS 2815, *8 (July 5, 1990). Moreover, even assuming that the trial court improperly limited voir dire, the Estate has not demonstrated that its inability to present the prospective jurors with a

very precise hypothetical resulted in any prejudice in light of the questioning that the Estate was allowed to pursue.

{¶50} Given the foregoing, the Estate's second assignment of error is overruled.

III.

{¶51} The Estate's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
SCHAFER, J.
CONCUR.


APPEARANCES:

STEPHEN P. HANUDEL, Attorney at Law, for Appellant.

KIRK E. ROMAN, Attorney at Law, for Appellee.