[Cite as *Rivenbark v. Discount Drug Mart*, 2018-Ohio-4072.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | | |
|---|---|---|
| CLIFF RIVENBARK | | C.A. No. 17CA0089-M |
| Appellant | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| DISCOUNT DRUG MART | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellee | | CASE No. 14CIV0682 |

DECISION AND JOURNAL ENTRY

Dated: October 9, 2018

CARR, Judge.

{¶1} Plaintiff-Appellant Clifford Rivenbark appeals from the judgment of the Medina County Court of Common Pleas. This Court affirms.

I.

{¶2} Mr. Rivenbark began working for Defendant-Appellee Discount Drug Mart ("Drug Mart") in 1999 in Drug Mart's manager training program. In 2002, Mr. Rivenbark sought treatment for worsening depression and was ultimately diagnosed with bipolar disorder. During this time period Mr. Rivenbark also began experiencing difficulties in his position and ultimately chose to be transferred to the Drug Mart warehouse in 2004 and began working as a stocker.

{¶3} In September 2007, Mr. Rivenbark went to Cleveland to pick up some Cavs tickets and, while he was in a crosswalk, he was struck by a car. Mr. Rivenbark sustained serious injuries, including fractures to his left tibia and fibula. Those leg injuries required

surgical repair which included stabilization with screws and plates.  Mr. Rivenbark utilized leave under the Family Medical Leave Act ("FMLA") and returned to work in early January 2008 without any restrictions.

{¶4}    However, shortly after he returned to work, Mr. Rivenbark found it difficult to work an entire 40-hour work week as the work that he was doing was causing strain to his legs. Mr. Rivenbark also began to feel that he was being harassed and forced to do work that other employees in his position were not required to do.  In December 2008, following a meeting with Mr. Rivenbark, the then director of human resources wrote Mr. Rivenbark a letter.  In that letter, the director noted Mr. Rivenbark's concerns with respect to the duties of his job and their effects on his legs, and raised the issue of whether Mr. Rivenbark's injuries might affect his ability to perform the job or cause him to pose a threat to himself or a co-worker.  The letter further informed Mr. Rivenbark that he would be placed on light duty until Drug Mart received a letter from his physician stating that he did not pose a direct threat to himself or others.  Mr. Rivenbark's physician responded to the request and indicated that, with reasonable accommodation, Mr. Rivenbark could perform the job and not pose a direct threat to the safety of himself or others.

{¶5}    Due to swelling in his legs, Mr. Rivenbark began using his break time to go to his car to elevate his leg.  Because of that, Mr. Rivenbark was often a few minutes late back to work and would accumulate attendance points on his record.  In order to address the issue, Mr. Rivenbark went to his doctor and got a handicap parking sticker to park closer and began using an unoccupied room to elevate his leg.  In April 2009, Mr. Rivenbark's doctor submitted a note requesting that Mr. Rivenbark be given a few extra minutes to warm-up following a period of inactivity.  Bob Waugh, the director of distribution at Drug Mart, who managed the warehouse,

responded to Mr. Rivenbark's request for additional time to warm-up and stated that he would be granted an extra fifteen minutes of unpaid time at each lunch period that he may or may not need to use. That additional time was to be "applied toward [his] allotted FMLA time."

{¶6} In 2010, a position opened up for an order selector at the Drug Mart warehouse and Mr. Rivenbark applied for it. He knew that he had worked well with that supervisor in the past and was hoping to get away from some of the harassment he believed he was experiencing in the stocker position. As an order selector, Mr. Rivenbark was responsible for pulling the orders for a store and placing them into totes. Representatives from Drug Mart maintained that order selectors were to pull items for one store at a time; however, Mr. Rivenbark maintained there was no one way order selectors performed the job. In order to walk as little as possible given his injuries, from June 2010 to October 2010, Mr. Rivenbark pulled items for more than one store at a time.

{¶7} In the fall of 2010, Drug Mart management became aware that Mr. Rivenbark was pulling items for four stores at a time. When this was initially discovered, Mr. Rivenbark was instructed to only pull one store at a time. However, the management at Drug Mart reported the issue to human resources and discussions were had and it was agreed that Mr. Rivenbark could be allowed to pull two stores at a time. In addition, there were times when employees were sent to help Mr. Rivenbark, as was done with all employees. Mr. Waugh indicated that Mr. Rivenbark sometimes turned the help away, stating that he did not wish to have it.

{¶8} Mr. Rivenbark disputed that Drug Mart returned to allowing him to pull two stores at a time and maintained that that accommodation was removed in December 2010. Drug Mart representatives maintained that after the accommodation was reinstated, it was not taken away again.

{¶9}     Irrespective, Drug Mart did request that Mr. Rivenbark provide documentation from his physician about his limitations and described the accommodation of pulling two stores as temporary.  In December 2010, Mr. Rivenbark's physician sent a letter to Drug Mart human resources indicating that, under Mr. Rivenbark's "current work conditions he [could] get through the entire work day without much difficulty (very little pain and swelling).  If there were to be a change in his work routine then this could cause increased pain and swelling.  A change could also cause a decrease in his level of functioning.  His accommodation should be continued[.]"  The director of human resources responded to Mr. Rivenbark's physician in writing.  The letter expressed that, based upon the doctor's reply, Drug Mart was uncertain what Mr. Rivenbark's physical limitations were.  The letter mentioned that Mr. Rivenbark had relayed a concern about how much he could walk and requested that the physician indicate a percentage of time that Mr. Rivenbark could stand or walk in an eight hour day.  In March 2011, Mr. Rivenbark's physician responded with a letter stating that it was his understanding that Mr. Rivenbark was walking frequently at work and that by the end of the week he was experiencing increased pain and swelling.  The doctor expressed that it would be in Mr. Rivenbark's best interests to accomplish his work with the least amount of walking.  Representatives of Drug Mart maintained that the doctor's responses were insufficient to document Mr. Rivenbark's limitations and restrictions.

{¶10}     In May 2011, Mr. Rivenbark took his concerns to the president of the retail division of Drug Mart and had a meeting with him and the vice president of loss prevention and business development.  Mr. Rivenbark asserted that he again requested that he be allowed to pull two stores at a time and informed them that he would be taking his concerns outside the company.  According to Mr. Rivenbark, the vice president told Mr. Rivenbark that "[w]e're going to turn it around on you 180 degrees."

{¶11} In 2012, Mr. Rivenbark took several weeks of FMLA leave and also had multiple other absences. After Mr. Rivenbark was absent for a couple days near the end of July 2012, when he returned, he discovered that he was transferred to working in staging in the warehouse. Mr. Rivenbark's hours and pay were not decreased, but Mr. Rivenbark nonetheless viewed the transfer as a demotion and was not happy about it. Representatives of Drug Mart maintained that the transfer was necessary in light of the nature of the order selector job and Mr. Rivenbark's absences which negatively impacted the order selection process. In addition, the staging position involved less walking which Drug Mart believed was more in line with Mr. Rivenbark's limitations. However, Mr. Rivenbark found the position more physically challenging as it involved more lifting.

{¶12} Over the next few weeks, Mr. Rivenbark had multiple meetings with Drug Mart management and human resources employees where he expressed his displeasure with the transfer and the difficulties he was having in the new position, including a workplace injury. The human resources manager, Leigh Ring, met with Mr. Rivenbark on multiple occasions after his transfer to staging. According to Ms. Ring, Mr. Rivenbark was more angry, irrational, and unreasonable by the end of July 2012.

{¶13} On August 9, 2012, Mr. Rivenbark met with Ms. Ring again. During the encounter, Ms. Ring became frightened of Mr. Rivenbark and when he went to pull something out of his pocket, which turned out to be a letter, she became concerned it might be a gun. Ms. Ring described Mr. Rivenbark as becoming increasingly angry, accusatory, and animated. She indicated that Mr. Rivenbark flexed his muscles and also was tearing paper into tiny pieces and dropping the pieces on the desk. She indicated that his hands were trembling when he talked. At one point, Ms. Ring told Mr. Rivenbark that he was intimidating her but Mr. Rivenbark did not

respond to the statement. Mr. Rivenbark's letter, which he prepared and read to Ms. Ring, detailed his frustration with Drug Mart's failure to grant his accommodation requests and expressed concern over possible future retaliation. Mr. Rivenbark indicated that he wanted a response within 10 days from Drug Mart so that he could pursue other action as necessary. Mr. Rivenbark did not yell at Ms. Ring or threaten her. Nonetheless, Ms. Ring felt afraid and reported the interaction to Mr. Waugh. Ultimately, Drug Mart terminated Mr. Rivenbark. Drug Mart maintained it did so based upon Mr. Rivenbark's intimidation of Ms. Ring on August 9, 2012. Mr. Rivenbark believed that Drug Mart terminated him for requesting accommodations. Mr. Rivenbark was also notified that he was no longer permitted on Drug Mart property.

{¶14} In 2013, Mr. Rivenbark filed a complaint against Drug Mart containing four counts. Count one was a public policy tort claim, count two alleged disability discrimination in violation of R.C. 4112.02 et seq, count three alleged retaliation in violation of R.C. 4112.02(I), and count four involved the denial of public access to Drug Mart's property. Ultimately, only count three, the alleged violation of R.C. 4112.02(I), was submitted to the jury for consideration. The jury found in favor of Drug Mart on that count. The jury specifically found Drug Mart did not terminate Mr. Rivenbark because he requested a physical accommodation or because he objected to Drug Mart's response to his request for accommodation. The trial court entered judgment accordingly.

{¶15} Mr. Rivenbark appealed; however, this Court dismissed the attempted appeal as non-final concluding some counts were not resolved. The trial court issued an additional judgment entry and Mr. Rivenbark appealed, pro se, raising six assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN EXCLUDING ANY MENTION OF BIPOLAR DISORDER IN THE SECOND HALF OF THE TRIAL AND IN INSTRUCTING THE JURY NOT TO CONSIDER M. RIVENBARK'S BIPOLAR DISORDER FOR ANY REASON DURING THEIR DELIBERATIONS.

{¶16} Mr. Rivenbark argues in his first assignment of error that the trial court erred in excluding any mention of bipolar from the second half of the trial and in instructing the jury not to consider Mr. Rivenbark's bipolar diagnosis in rendering a verdict.

Background

{¶17} During Mr. Rivenbark's presentation of evidence, he offered the testimony of Dr. Michael Seng, Mr. Rivenbark's psychiatrist who treated Mr. Rivenbark for bipolar disorder. Dr. Seng was presented as a fact witness, not an expert witness. At the end of Mr. Rivenbark's presentation of evidence, Drug Mart moved for a directed verdict. In discussing the motion with the parties, the trial court asked Mr. Rivenbark's counsel whether he was claiming that Drug Mart failed to accommodate his bipolar disorder or just the physical injury. Counsel for Mr. Rivenbark responded that the failure to accommodate related to Mr. Rivenbark's leg injury, not his bipolar disorder. The trial court then stated the following:

> It is the Court's ruling that there has been no evidence relating to the bipolar disorder as it being a disability that's relevant to this case. There's been no requests for accommodation. Dr. Seng didn't testify to anything, any behaviors of the [Plaintiff] related to this case were caused by the bipolar disorder[.] What this means is that there will be no further mention of the bipolar in this case. Dr. Seng did not testify that your client's actions on the date that he was terminated or the date that he read the letter were caused by this bipolar so we're done with the bipolar.

{¶18} Mr. Rivenbark's counsel attempted to interject something, but the trial court continued, saying, "[w]e're done with the bipolar. That is no longer an issue in this case. It is

more prejudicial than it is probative and you have not established it through any medical testimony." The parties' counsel then sought clarification about what could be presented. At the end of the discussion, the court stated that, "in the Court's opinion, anything to do with the bipolar is not relevant to the pertinent issue in this matter." Mr. Rivenbark's counsel did not object and instead said, "All right, Your Honor. Fine. I'll work with that."

{¶19} Notwithstanding the foregoing, during the admission of Mr. Rivenbark's exhibits, Dr. Seng's notes were initially admitted without any objection. Following a break, the trial court informed the jury that "the scope of the case has been narrowed and at this point in time [the jury is] no longer to consider any issues related to any allegation of failure to accommodate issues of bipolar disorder. The sole issue in the case at this time will now be whether [] Drug Mart failed to accommodate and/or wrongfully discharged [Mr. Rivenbark] in retaliation for requesting an accommodation as it relates to injuries to his leg and any limitations imposed by that leg injury." The trial court then asked Mr. Rivenbark's counsel if that was accurate, and his counsel agreed that it was.

{¶20} After the presentation of Drug Mart's case, the issue of the admission of Dr. Seng's notes again was raised. After a long discussion, during which counsel for Drug Mart initially agreed with their admission, counsel for Drug Mart ultimately objected to their admission. Counsel for Mr. Rivenbark then said, "All right. Fine. They're out."

{¶21} With respect to jury instructions, both parties did submit proposed instructions prior to trial. When the trial court brought up the issue at the end of trial, Mr. Rivenbark's counsel stated that he anticipated that he would get together with opposing counsel "and work out any disputes and submit it to the Court[.]" Drug Mart's counsel seemed skeptical of the idea but Mr. Rivenbark's counsel told the trial court that he believed they would "get this worked

out." The trial court agreed to let the attorneys do so. When the matter was back on the record, the trial court asked Mr. Rivenbark's counsel whether he had any objections to the jury instructions as they were submitted. Mr. Rivenbark's counsel replied that the jury charge was acceptable.

{¶22} The instructions read to the jury included the following: "During the presentation of Mr. Rivenbark's case, you heard testimony regarding Mr. Rivenbark's bipolar disorder. This is no longer an issue in the case and is irrelevant to your verdict. You are, therefore, instructed not to consider Mr. Rivenbark's bipolar disorder as you deliberate and reach a verdict." After reading the instructions to the jury, the trial court asked whether Mr. Rivenbark's counsel had anything to add and Mr. Rivenbark's counsel responded in the negative.

Discussion

{¶23} Under the circumstances of this case, we conclude that Mr. Rivenbark failed to preserve his argument that the trial court erred in excluding any mention of bipolar from the second half of the trial and in instructing the jury not to consider Mr. Rivenbark's bipolar diagnosis in rendering a verdict.

{¶24} Mr. Rivenbark's counsel did not object to the court's ruling to exclude evidence related to bipolar from the remainder of the case. *See Klossner v. Burr*, 9th Dist. Wayne No. 16AP0069, 2018-Ohio-1663, ¶ 9 ("It is well settled that the failure to timely object to a possible error results in a forfeiture of the issue for purposes of appeal.") (Internal quotations and citations omitted.) In fact, Mr. Rivenbark's counsel appeared to acquiesce in the decision. In addition, Mr. Rivenbark's counsel did not object to the challenged jury instruction. *See M.S. v. Toth*, 9th Dist. Medina No. 16CA0038-M, 2017-Ohio-7791, ¶ 38, citing Civ.R. 51(A). Instead, it appears from the record, that it is more than likely that Mr. Rivenbark's counsel collaborated

on the instructions that were presented to the jury. Accordingly, we conclude that Mr. Rivenbark, at a minimum, forfeited these issues for review. Further, while Mr. Rivenbark mentions plain error in his briefing, he has failed to develop a plain error argument and we decline to do so on his behalf. *See Cappara v. Avon Lake,* 9th Dist. Lorain No. 16CA011014, 2017-Ohio-8262, ¶ 16.

{¶25} While it appears that Mr. Rivenbark did contest the exclusion of Dr. Seng's notes, we note that a challenge to that precise issue is outside the scope of Mr. Rivenbark's stated assignment of error. *See State v. Martynowksi*, 9th Dist. Lorain No. 17CA011078, 2017-Ohio-9299, ¶ 18. Moreover, even assuming that the issue was properly before us, in light of the jury instructions which informed the jury that it should not consider Mr. Rivenbark's bipolar disorder, we fail to see how the exclusion of Dr. Seng's notes, which presumptively discussed Mr. Rivenbark's bipolar condition, prejudiced Mr. Rivenbark. *See* Civ.R. 61.

{¶26} Mr. Rivenbark's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED WHEN IT ALLOWED JANET KILBANE TO TESTIFY AS AN EXPERT AS TO MATTERS THAT WERE NOT BEYOND THE KNOWLEDGE AND EXPERIENCE OF LAYPERSONS AND INSTEAD WAS USED TO BOLSTER THE CREDIBILITY OF [DRUG MART] AND UNDERMINE THE CREDIBILITY OF PLAINTIFF.

{¶27} Mr. Rivenbark argues in his second assignment of error that the trial court erred in allowing a witness to testify as an expert as to matters that were not beyond the knowledge and experience of laypersons.

### Background

{¶28} As part of his claims, Mr. Rivenbark asserted that it was unlikely that he would be employed again and sought front pay; Drug Mart disputed that claim. In order to support its

argument, Drug Mart sought to have Janet Kilbane, a vocational specialist, testify in order to aid the jury's understanding of Mr. Rivenbark's employability.

{¶29} At the time of trial, Ms. Kilbane had worked in the field for 25 years. As a rehabilitation counselor she chose to work with industrial injuries, which she described as largely orthopedic and neurological. Ms. Kilbane indicated that all of the people she works with have some sort of "barrier or impairment to overcome[.]" She explained that she often goes with clients to doctors' appointments to assist in the discussion about what is needed to get the person back to work. She also conducts vocational assessments. She relayed that she will look at a person's restrictions and determine whether rehabilitation or retraining is needed, and whether the person has transferrable skills. In addition, prior to suggesting retraining, she ensures that jobs are available in that field and works with the person on how to be successful in obtaining a job.

{¶30} Ms. Kilbane testified that she reviews job descriptions and deals with issues like work restrictions and accommodations on a regular basis. As part of her work, she relies on software that allows her to input someone's job history, impairments, and other information into the program and the software will then list appropriate types of jobs for that person. It will list both jobs the person is capable of doing at the time and jobs that the person can do with some training. Ms. Kilbane also discussed that the Department of Labor statistics can be used to locate median average wages for a job in a particular area and also show the growth rate for employment in a particular county. Ms. Kilbane explained that sometimes people only look in their backyards for jobs and the statistics can be helpful in convincing a person that a nearby county might have better job prospects.

{¶31} Ms. Kilbane then testified about the job transferability analysis she performed for Mr. Rivenbark which included types of jobs that would be suitable for him and the job market in his area and surrounding areas. Ms. Kilbane also discussed her familiarity with job searches and online applications. She went on to point out what she perceived as problems with Mr. Rivenbark's resume and detailed her understanding of Mr. Rivenbark's job search.

Discussion

{¶32} "The admission or exclusion of expert testimony lies in the sound discretion of the trial court and will, therefore, not be overturned absent an abuse of that discretion." (Internal quotations and citations omitted.) *Magnum Steel & Trading, LLC v. Mink,* 9th Dist. Summit Nos. 26127, 26231, 2013-Ohio-2431, ¶ 35. "Evid.R. 702 governs the admissibility of expert testimony in Ohio." *State v. Jackson*, 9th Dist. Summit Nos. 27132, 27133, 27158, 27200, 2015-Ohio-5246, ¶ 52. The rule permits a witness to testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and]
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

Evid.R. 702.

{¶33} On appeal, Mr. Rivenbark only appears to challenge whether the expert's testimony was in compliance with Evid.R. 702(A). As a general proposition, we cannot say that the trial court abused its discretion in allowing Ms. Kilbane to testify. While some aspects of job searches may be within the knowledge of the average person, Ms. Kilbane had specific training and years of experience evaluating people with impairments for job placement. The mere fact

that members of the jury were employed does not mean that the jury would necessarily have knowledge of Mr. Rivenbark's employability or would know whether his skills were transferrable to other positions.

{¶34} Moreover, Mr. Rivenbark has not convinced us that any error in admitting the testimony of Ms. Kilbane prejudiced him. *See* Civ.R. 61. Ms. Kilbane's testimony related to a damages issue; an issue that would only become relevant to the jury after it concluded that Drug Mart was liable. Instead, the jury specifically found that Drug Mart did not terminate Mr. Rivenbark because he requested a physical accommodation or because he objected to Drug Mart's response to his request for accommodation. Accordingly, the jury was not faced with evaluating whether Mr. Rivenbark conducted an appropriate job search as such related to determining an appropriate damages award.

{¶35} To the extent that Mr. Rivenbark appears to be arguing that Ms. Kilbane's testimony was inappropriately used by Drug Mart in closing argument or elsewhere, such arguments are outside the scope of Mr. Rivenbark's stated assignment of error and will not be considered. *See Martynowksi*, 2017-Ohio-9299, at ¶ 18.

{¶36} With respect to Ms. Kilbane's actual testimony, one of Mr. Rivenbark's primary contentions is that Ms. Kilbane's testimony invaded the province of the jury because when she testified that Mr. Rivenbark only completed one application, she was contradicting Mr. Rivenbark's testimony and was essentially passing upon Mr. Rivenbark's credibility. Initially, we note that we are not convinced that Ms. Kilbane's testimony amounted to her opining on Mr. Rivenbark's credibility. Irrespective, the testimony Mr. Rivenbark complains about and objected to was very similar to some of Ms. Kilbane's earlier testimony, which Mr. Rivenbark has not expressly challenged on appeal. Therein, Ms. Kilbane testified without objection that she only

found one online application that Mr. Rivenbark completed. Given the foregoing, we fail to see how the admission of the later testimony can be anything other than harmless error at best. *See State v. Dennis,* 9th Dist. Summit No. 28593, 2018-Ohio-2495, ¶ 29; Civ.R. 61.

**{¶37}** In light of the foregoing, Mr. Rivenbark has failed to demonstrate that the trial court committed reversible error in admitting Ms. Kilbane's testimony. Mr. Rivenbark's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN ALLOWING THE JURY TO HEAR EVIDENCE OF HOW [DRUG MART] REGULARLY ACCOMMODATED OTHER EMPLOYEES' REQUESTS FOR ACCOMMODATION.

**{¶38}** Mr. Rivenbark argues in his third assignment of error that the trial court erred in allowing the jury to hear evidence of how Drug Mart treated other employees and evidence that Drug Mart regularly accommodated disabled employees. Mr. Rivenbark argues that the testimony was given in violation of Evid.R. 404(B) and did not satisfy the requirements of Evid.R. 406.

**{¶39}** "In general, [t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." (Internal quotations and citation omitted.) *Wiegand v. Fabrizi Trucking & Paving Co.*, 9th Dist. Medina No. 16CA0015-M, 2017-Ohio-363, ¶ 15.

**{¶40}** First, Mr. Rivenbark challenges the testimony of the director of human resources who testified that Drug Mart had provided disability accommodations to hundreds of employees over the course of her tenure with company. While Mr. Rivenbark's counsel did object to that testimony, he failed to object to earlier testimony of the same witness touching on similar issues. The director of human resources testified without objection that it was Drug Mart's policy to follow the Americans with Disabilities Act, and, thus, the company tried to accommodate

disabled employees. She testified that, under the act, she believed that it was Drug Mart's responsibility to provide reasonable accommodations to employees that provided Drug Mart with disability information. She further averred that Drug Mart had 3,800 employees and did have disabled employees. Finally, Mr. Rivenbark's counsel asked the director of human resources whether it was Drug Mart's position that it always followed the Americans with Disabilities Act when it was dealing with Mr. Rivenbark. The director responded that it was. Given the foregoing, we fail to see how, even assuming that the objected to testimony was improper, admission of the challenged testimony prejudiced Mr. Rivenbark in light of the testimony that was not objected to below or challenged on appeal. *See Dennis,* 2018-Ohio-2495, at ¶ 29; Civ.R. 61.

{¶41} Mr. Rivenbark additionally argues that it was improper to allow the director of human resources to testify about how Drug Mart typically handled situations with other employees because it was irrelevant as to how Drug Mart handled Mr. Rivenbark's situation. However, Mr. Rivenbark mischaracterizes the nature of the testimony. The director was first asked whether, with respect to a meeting in May 2012 with Mr. Rivenbark, Drug Mart was trying to coerce Mr. Rivenbark to take FMLA leave. The director responded that Drug Mart was not trying to do so, and instead the company wanted Mr. Rivenbark to be aware of his rights. Only then did counsel for Drug Mart ask whether the foregoing was typical or atypical with respect to how human resources would approach an employee. Over objection, the director responded that it was typical. Thus, the director did opine about Mr. Rivenbark's particular situation, and, only after doing so, commented that that approach was typical. Mr. Rivenbark has failed to explain how this testimony, when properly characterized, prejudiced him. *See* App.R. 16(A)(7); *see* Civ.R. 61.

{¶42} Finally, Mr. Rivenbark challenges the admission of certain testimony of the vice president of loss prevention and business development. Over objection, that witness was asked whether he had terminated any employee because the employee had a disability, to which the witness responded in the negative. Following that question, a leading question was asked without objection. Thereafter, another leading question was asked, which also garnered an objection. At that point, Mr. Rivenbark's counsel remarked that "this is leading testimony." Thereafter, in overruling the objection, the trial court responded that "we are just moving through the facts of the case." Nothing in the record suggests that Mr. Rivenbark's counsel objected to the testimony on the basis that it violated Evid.R. 404(B) or Evid.R. 406. Instead, from the record, it appears that the objections to the questions in that series were to the leading nature of those questions. Mr. Rivenbark has not challenged the trial court's ruling on that issue on appeal, nor has he demonstrated that the trial court committed plain error in allowing the testimony in violation of Evid.R. 404(B) or Evid.R. 406. *See State v. Maple*, 9th Dist. Summit No. 25313, 2011-Ohio-1216, ¶ 12.

{¶43} Mr. Rivenbark's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN ALLOWING IRRELEVANT NON-PROBATIVE EVIDENCE THAT CLIFF RIVENBARK WENT TO CAVS GAMES AFTER HIS TERMINATION, AND EVIDENCE THAT CLIFF RIVENBARK RECEIVED A PERSONAL INJURY SETTLEMENT, AS WELL AS IRRELEVANT EVIDENCE CONCERNING MR. RIVENBARK'S CONDUCT AT A DISCOVERY DEPOSITION, IN AN EFFORT TO MALIGN PLAINTIFF ON MATTERS THAT HAD NOTHING TO DO WITH THE ISSUES IN THE CASE.

{¶44} Mr. Rivenbark argues in his fourth assignment of error that the trial court improperly admitted evidence about his attendance at sporting events, his conduct at a deposition, and his participation in a settlement conference. He argues that the evidence was

irrelevant and prejudicial. Mr. Rivenbark argues that the evidence with respect to the settlement conference and his attendance at sporting events portrayed him as having adequate finances such that he would not need to be compensated and the evidence about his conduct at the deposition improperly portrayed Mr. Rivenbark as "odd."

<u>Settlement Conference</u>

**{¶45}** Mr. Rivenbark challenges the admission of an exhibit which is a letter from Mr. Rivenbark's former attorney to the then-director of human resources at Drug Mart. Much of the letter discusses how the attorney would follow up with Mr. Rivenbark to explain to him the benefit of using FMLA leave to have past attendance points removed and to accommodate any future warm up time. The second paragraph mentions that Mr. Rivenbark would need to be excused on a certain date to appear at a settlement conference related to his injury. Mr. Rivenbark has not explained why the majority of the letter would be inadmissible and instead focuses only on the portion that mentions Mr. Rivenbark's attendance at a settlement conference. *See* App.R. 16(A)(7). Even assuming such discussion should have been stricken from the exhibit, we fail to see any prejudice from the admission of the letter containing that statement. *See* Civ.R. 61. Based upon other testimony, which has not been challenged on appeal, the jury heard that as of December 2008, Mr. Rivenbark was advised by his attorney to pursue action against the driver of the vehicle. The May 2009 letter challenged on appeal only mentions that a settlement conference was to take place. It mentions no other details nor does it indicate that Mr. Rivenbark had received or would receive any proceeds. Accordingly, it is difficult to say that the admission of that exhibit misrepresented Mr. Rivenbark's financial circumstances.

## Attendance at Sporting Events

**{¶46}** Mr. Rivenbark also challenges the testimony of the director of human resources who testified that, after his termination, she saw Mr. Rivenbark at an Indians game and a Cavs game. She described the seats at the Indians game as being club seats and including all you can eat food. Even assuming this testimony was irrelevant and therefore inadmissible, Mr. Rivenbark himself testified extensively about his passion for attending sporting events, particularly Cavs games. He testified that he has season tickets to the Cavs and often had extra seats to the games which he sometimes resold. For example, Mr. Rivenbark testified that, for that "Friday's game[,] because of [his] passion and [his] loyalty to the Cavaliers, [he had] 51 tickets that [he was] not going to use and the[ tickets were] not for sale at [that] point [but] [i]f [his] friends want[ed] to go, [he] [would] let them go." Thus, we fail to see how the director of human resources' testimony prejudiced Mr. Rivenbark in light of his own testimony on the subject. *See* Civ.R. 61.

## Mr. Rivenbark's Deposition Behavior

**{¶47}** Mr. Rivenbark also asserts that the vice president of loss prevention and business development should not have been permitted to testify about Mr. Rivenbark's behavior at the vice president's deposition. While Mr. Rivenbark did object to the testimony, he did so on the basis that the deposition itself did not contain a record of Mr. Rivenbark's behavior; thus, Mr. Rivenbark's counsel argued that there was no good faith basis to ask that question. However, on appeal, Mr. Rivenbark has instead argued that the testimony was irrelevant and prejudicial, objections that were not raised below. Accordingly, Mr. Rivenbark has forfeited the argument he now makes and has not developed a plain error argument. *See Maple*, 2011-Ohio-1216, ¶ 12.

**{¶48}** Mr. Rivenbark's fourth assignment of error is overruled.

**ASSIGNMENT OF ERROR V**

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO GIVE ANY JURY INSTRUCTIONS OR GUIDANCE CONCERNING PRETEXT, RESULTING IN INSTRUCTIONS THAT WERE INCORRECT AS A MATTER OF LAW AND PREJUDICED PLAINTIFF.

{¶49} Mr. Rivenbark argues in his fifth assignment of error that the trial court committed plain error in failing to instruct the jury on pretext. Mr. Rivenbark maintains that the absence of a separate pretext instruction rendered the instructions incomplete and misleading.

{¶50} Civ.R. 51(A) provides in relevant part that, "[o]n appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." As discussed above, Mr. Rivenbark's counsel did not object to the jury instructions. In fact, it appears he collaborated with opposing counsel in drafting them. Thus, at best, Mr. Rivenbark is limited to arguing plain error on appeal.

{¶51} "A plain error is one that is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings. Plain error occurs when, but for the error, the outcome of the trial clearly would have been otherwise." (Internal quotations and citations omitted.) *White v. Artistic Pools, Inc.,* 9th Dist. Summit No. 24041, 2009-Ohio-443, ¶ 8. "In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss v. Davidson,* 79 Ohio St.3d 116, 121 (1997).

{¶52} While Mr. Rivenbark mentions plain error in his assignment of error, he has neither set forth the plain error standard nor explained how he has satisfied the high burden necessary to demonstrate plain error. *See* App.R. 16(A)(7). We note that the citations that Mr. Rivenbark relies on do not deal with claims brought pursuant to R.C. 4112.02(I) or even the comparable federal counterpart. Mr. Rivenbark has not pointed to a single case which states that a separate pretext instruction is necessary in a case involving R.C. 4112.02(I). Therefore, we cannot say that Mr. Rivenbark has met his burden of demonstrating plain error on appeal. *See M.H. v. J.P.*, 9th Dist. Lorain Nos. 15CA010832, 15CA010833, 2017-Ohio-33, ¶ 8.

{¶53} Mr. Rivenbark's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

THE JURY'S VERDICT IN THIS CASE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED.

{¶54} Mr. Rivenbark argues in his sixth assignment of error that the verdict was against the manifest weight of the evidence. Specifically, Mr. Rivenbark argues that the weight of the evidence did not support that Drug Mart had a legitimate nondiscriminatory reason for terminating Mr. Rivenbark's employment. Mr. Rivenbark maintains there was no credible evidence to support that he intimidated Ms. Ring.

{¶55} "When an appellant challenges the weight of the evidence in a civil case, this Court 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Lubanovich v. McGlocklin*, 9th Dist. Medina No. 14CA0081-M, 2015-Ohio-4618, ¶ 5, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, however, we are always mindful of the presumption in favor of the trial

court's factual findings. [T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." (Internal quotations and citations omitted.) *T.S. v. R.S.*, 9th Dist. Summit No. 27955, 2017-Ohio-281, ¶ 4.

{¶56} "To establish a case of retaliation [pursuant to R.C. 4112.02(I)], a claimant must prove that (1) []he engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi,* 116 Ohio St.3d 324, 2007-Ohio-6442, ¶ 13; *see also Messer v. Summa Health Sys.*, 9th Dist. Summit No. 28470, 2018-Ohio-372, ¶ 47. "If a complainant establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. If the employer satisfies this burden, the burden shifts back to the complainant to demonstrate that the proffered reason was not the true reason for the employment decision." (Internal quotations and citations omitted.) *Greer-Burger* at ¶ 14.

{¶57} The only disputed issue on appeal is whether Drug Mart terminated Mr. Rivenbark's employment for nondiscriminatory reasons. The parties presented competing views of the August 9, 2012 meeting between Ms. Ring and Mr. Rivenbark that ultimately led to Mr. Rivenbark's termination. In addition, they presented conflicting evidence on Drug Mart's willingness to accommodate Mr. Rivenbark. Mr. Rivenbark maintained that, late in 2010, Drug Mart stopped allowing him to pull items for two stores at a time, and instead required him to pull only one store at time. Drug Mart, on the other hand, asserted that there was only a span of a few days during which that accommodation was removed; however, it was thereafter reinstated. And while Drug Mart argued that it continued the accommodation, Drug Mart was nonetheless of the

position that Mr. Rivenbark had not provided sufficient documentation from his physician about his restrictions and limitations. Overall, Mr. Rivenbark provided testimony that if believed, could demonstrate a pattern of Drug Mart not addressing or inadequately addressing his accommodation needs, while Drug Mart presented evidence that, if believed, supported its contention that it was responsive to Mr. Rivenbark's concerns and that its response was limited by the lack of complete information from Mr. Rivenbark's physician. Whereas Mr. Rivenbark attempted to demonstrate that Drug Mart should have had all of the information that it needed from his physician.

{¶58} With respect to the August 9, 2012 meeting, Mr. Rivenbark maintained that he went into the conference room where Ms. Ring maintained open hours and read her a two-page letter he had written over the past weekend. That letter discussed how Mr. Rivenbark was diagnosed with bipolar and how Drug Mart had worked out reasonable accommodations for him in that instance. The letter went on to discuss Mr. Rivenbark's accident involving the car and how he believed the relevant information was in his file. Mr. Rivenbark maintained that he began asking for accommodations in 2008 and had continued to do so up until that day. Mr. Rivenbark maintained that he needed an accommodation and believed that Drug Mart had ignored and denied his requests. Mr. Rivenbark asserted that he feared retaliation and asked that Drug Mart respond within ten days to his request for accommodation so that he could pursue additional action as necessary.

{¶59} Mr. Rivenbark asserted that, while reading the letter, he looked up and told Ms. Ring that, when he was first asking for accommodations, he at one point left a meeting with Ms. Ring crying because he thought she was laughing at him. When Mr. Rivenbark finished reading the letter, he asserted that he thanked Ms. Ring for her time and left the room. Mr. Rivenbark

maintained that he did not hear Ms. Ring say anything to him as he was reading the letter; however, he acknowledged that he was shaking while reading the letter and was focused on reading the letter. After leaving the room, Mr. Rivenbark finished his shift and then went home. Mr. Rivenbark maintained that he was terminated for requesting an accommodation.

{¶60} Ms. Ring's description of the meeting was far different. She maintained that Mr. Rivenbark did not come and merely read a two-page letter. Instead, she asserted that the encounter lasted approximately 30 minutes. She acknowledged that Mr. Rivenbark did not yell at her and had never threatened her. Nonetheless, by the end of the meeting Ms. Ring felt afraid and intimidated.

{¶61} Ms. Ring described that Mr. Rivenbark's behavior had begun to change towards the end of July, after he was moved to the staging position. Ms. Ring testified that she had dealt with Mr. Rivenbark and his "ups and downs" a lot over the years, but never before the end of July 2012 felt the increase in concern that she had at that time. She noted that Mr. Rivenbark had become "more angry, more irrational, more unreasonable and didn't really take in to consideration what you had to say." Because of that shift in behavior, prior to August 9, 2012, she went into the conference room and began to see if there were alternate exits to the room and contemplated where to sit so that she would have easy access to an exit. Ms. Ring testified that she had reported her concerns to her co-workers in human resources and the vice president of loss prevention and business development testified that the human resources department had their own internal code to communicate with each other when someone was meeting with Mr. Rivenbark. After the meeting on August 9, 2012, Ms. Ring reported to Mr. Waugh that, due to her concerns about Mr. Rivenbark, the employees in human resources previously agreed that if

Ms. Ring did not return from her open hours in the conference room by a certain time, they would come looking for her.

{¶62} Ms. Ring testified that the first 30 seconds or minute of the August 9, 2012 meeting were fairly "light hearted[.]" Shortly after, Ms. Ring indicated his demeanor changed. "[H]e became increasingly angry, accusatory, demonstrative, animated. He had a tone. He never yelled but he had a tone and [was] ripping up paper, flexing his muscles." Mr. Rivenbark sat down and began describing how he had "flexed his muscles" with management in a prior meeting. He then tore a piece of paper off the calculator, began tearing it into little pieces, and dropping them on the desk. Ms. Ring found the manner in which he did it disturbing.

{¶63} Ms. Ring described that Mr. Rivenbark was difficult to follow and jumped from one subject to the next. Ms. Ring informed Mr. Rivenbark again that Drug Mart did not have his restrictions in his file. Mr. Rivenbark became very agitated, his hands were trembling, and he was shaking. He had a strange smile on his face as he was discussing how Drug Mart was treating him and how it was not accommodating him.

{¶64} When Mr. Rivenbark went to pull something out of his pocket, Ms. Ring became concerned that he might have a weapon. Ultimately, Mr. Rivenbark pulled out a statement he proceeded to read to her. The entire time Mr. Rivenbark was speaking he kept saying "you[,]" referring to Ms. Ring, did not do something and when Ms. Ring asked whether he was referring to her personally or Drug Mart, he responded, both. Ms. Ring felt that Mr. Rivenbark was holding her responsible for any perceived unfair treatment by Drug Mart.

{¶65} At this point, Ms. Ring became afraid. She described him as irrational and she did not know what he was going to do. She became increasingly concerned for her safety and, at one point, told Mr. Rivenbark that she was feeling intimidated by him. However, Mr. Rivenbark

offered no response to her comment. When Mr. Rivenbark was finished, he thanked her and left. Ms. Ring then called the human resources department to let them know she was okay and then went to talk to Mr. Waugh.

**{¶66}** Ms. Ring was very emotional during her meeting with Mr. Waugh and took a minute to calm down as she was trembling and teary-eyed when she came in. Ms. Ring relayed the incident to Mr. Waugh. Mr. Waugh believed that Ms. Ring was in fear of her life and that she was intimidated by Mr. Rivenbark. Mr. Waugh offered to call her husband and have him pick her up; however, she declined. Ms. Ring did tell Mr. Waugh that she no longer wanted to be alone with Mr. Rivenbark. After Ms. Ring went home on August 9, 2012, she talked to her husband about the incident. To ensure her safety, they agreed that her husband would meet her at work outside the parking lot and follow her home.

**{¶67}** The vice president of loss prevention and business development also spoke with Ms. Ring about the incident. After speaking with Ms. Ring, the vice president believed that there was a real threat and testified that he had "dealt with a lot of people and a lot of situations over the years and a lot of different levels within [Drug Mart], and [he had] never dealt with any employee that was that raw in [her] fear. She was * * * scared. She was really scared."

**{¶68}** Drug Mart's handbook listed serious violations that could result in immediate termination. One of those serious violations was "[i]mplied or actual harm, intimidation or flagrant discourtesy towards an employee, visitor or customer." The president of the retail division of Drug Mart, the chief financial officer, the director of human resources, and the vice president of loss prevention and business development discussed the incident. Ultimately, the president decided to terminate Mr. Rivenbark's employment due to his intimidation of Ms. Ring.

They did not interview or speak with Mr. Rivenbark about the encounter prior to deciding to terminate his employment.

{¶69}　Following Mr. Rivenbark's termination, Ms. Ring expressed concern that Mr. Rivenbark might know where she lived and asked the vice president of loss prevention and business development if he knew what type of vehicle Mr. Rivenbark drove because she was concerned that he might follow her home and was not sure what he was capable of doing.

{¶70}　After thoroughly and independently reviewing the record, we cannot say that the jury lost its way in concluding that Drug Mart did not terminate Mr. Rivenbark because he requested a physical accommodation or because he objected to Drug Mart's response to his request for accommodation.　The jury had the opportunity to observe both Mr. Rivenbark and Ms. Ring testify and also heard from Drug Mart employees who spoke to Ms. Ring after her encounter with Mr. Rivenbark.　While Mr. Rivenbark argues that his behavior at the August 9, 2012 meeting was similar to other behavior he exhibited throughout his tenure at Drug Mart, Ms. Ring testified that his behavior was changing toward the end of July 2012. Ms. Ring testified to dealing with Mr. Rivenbark on many other occasions and not being afraid.　Nonetheless, she averred that she was intimidated and afraid on August 9, 2012 and her fellow employees expressed that they believed her.　"Ultimately, [i]n reaching its verdict, the jury was in the best position to evaluate the credibility of the witnesses and it was entitled to believe all, part, or none of the testimony of each witness."　(Internal quotations and citations omitted.)　*Wade v. Mancuso*, 9th Dist. Lorain No. 16CA010978, 2018-Ohio-1563, ¶ 33.　Mr. Rivenbark has not demonstrated that the jury lost its way in evaluating credibility or in rendering a verdict.

{¶71}　Mr. Rivenbark's sixth assignment of error is overruled.

III.

**{¶72}** Mr. Rivenbark's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

CLIFF RIVENBARK, pro se, Appellant.

MICHAEL C. COHAN, Attorney at Law, for Appellee.