[Cite as *State v. Luntz*, 2021-Ohio-4045.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

STATE OF OHIO

    Appellee

    v.

SUSAN LUNTZ

    Appellant

C.A. No.     21CA0005-M

APPEAL FROM JUDGMENT
ENTERED IN THE
MEDINA MUNICIPAL COURT
COUNTY OF MEDINA, OHIO
CASE No.    19TRC06402

DECISION AND JOURNAL ENTRY

Dated: November 15, 2021

SUTTON, Judge.

{¶1}    Defendant-Appellant Susan Luntz appeals the judgment of the Medina Municipal Court. For the reasons that follow, this Court affirms.

I.

**Relevant Background Information**

{¶2}    The present appeal arises from a traffic stop on September 7, 2019, at 2:35 a.m., on Sleepy Hollow Road in Brunswick Hills Township, located in Medina County. Officer Zachary Getto, a patrolman for Brunswick Hills Police Department, observed a 2013 Kia Soul, with no headlights on, exit a parking lot behind a local bar onto a dark road. The vehicle pulled up to an intersection at a red light behind Officer Getto's police cruiser, still with no headlights. Officer Getto "flipped around" in a parking lot, got behind the Kia Soul, and the vehicle's operator then turned on the headlights.

{¶3} Officer Getto performed a traffic stop wherein he encountered Ms. Luntz, the driver and sole occupant of the vehicle. Based upon Officer Getto's observations of Ms. Luntz's "watery eyes," "mumbled speech," and "a strong odor of alcohol" coming from the vehicle, in conjunction with the headlights violation, Officer Getto had Ms. Luntz exit the vehicle in order to perform standardized field sobriety tests, including the horizontal gaze nystagmus test ("HGN"), the walk-and-turn test, and the one-leg stand test. After Ms. Luntz's performance on the standardized field sobriety tests, which was captured on video by Officer Getto's body camera, Ms. Luntz was placed under arrest for operating a vehicle under the influence of alcohol, pursuant to R.C. 4511.19(A)(1)(a), and was also cited for a headlight violation, pursuant to R.C. 4513.03(A). Although Ms. Luntz maintained she had not had any alcoholic beverages that evening, she refused to submit to a breathalyzer test at the Brunswick Hills Police Station, and her driver's license was immediately suspended.

{¶4} On September 9, 2019, Ms. Luntz, through counsel, pleaded not guilty, waived her speedy trial rights, and requested the matter be set for a pre-trial. On October 31, 2019, the record reveals a pre-trial conference was held and Ms. Luntz appeared with counsel. The pre-trial conference report indicated discovery was complete. A final pre-trial was held on November 13, 2019, wherein the State and Ms. Luntz were unable to reach resolution prior to trial. A bench trial was scheduled on January 7, 2020. However, on November 21, 2019, Ms. Luntz's new attorney filed a notice of appearance and substitution of counsel on behalf of Ms. Luntz, and also filed a jury demand and discovery request. The matter was then set for a jury trial on January 30, 2020.

## Motion to Suppress

{¶5}    Prior to trial on December 27, 2019, pursuant to Crim.R.12, Ms. Luntz filed a motion for leave to file a suppression motion outside of the time requirement allowed in the Ohio Rules of Criminal Procedure.[1]   Ms. Luntz also attached the proposed motion to suppress as Exhibit A and requested an oral hearing.  In her motion for leave to file, Ms. Luntz stated her former counsel failed to timely file both a motion to suppress and a motion for leave to file. However, Ms. Luntz did not indicate any actual reasons for these alleged failures.  Further, Ms. Luntz did not explain why her current counsel waited thirty-seven days, from the filing of his notice of appearance, to seek leave to file.

{¶6}    On December 30, 2019, only three days after the motion was filed, the trial court granted Ms. Luntz the requested leave to file the suppression motion and set it for oral hearing on January 10, 2020.  However, the State filed a motion for reconsideration because Ms. Luntz did not properly serve the State with the motion and the State first learned of the motion through the trial court's ruling.  In so doing, the State revealed that, prior to Ms. Luntz filing the leave to file, the State informed her counsel that it would object to such a motion if filed.  Further, on December 6, 2019, the State provided Ms. Luntz's counsel with contact information, including a facsimile number for purposes of receiving service.  Ms. Luntz, however, did not use that contact information and instead of serving the State, served the Brunswick *City* prosecutor by facsimile at a different number.  The State explained to the trial court that it did not receive service of Ms.

---

[1] Although this is a traffic case, we note the trial court analyzed the filing of the suppression motion pursuant to Crim.R. 12(D) instead of Traf.R. 11(C).  Because these rules contain identical language, this Court will also use Crim.R. 12(D) in our analysis for the sake of consistency.

Luntz's motion for leave to file prior to it being granted. It also argued Ms. Luntz failed to show "good cause" as to why she should be granted the requested relief.

{¶7} The trial court, in a detailed judgment entry journalized January 7, 2020, vacated its prior ruling because the State was never served with the motion. Further, the trial court reviewed the motion on its merits and ultimately denied it because Ms. Luntz failed to establish good cause for relief from the Crim.R. 12(H) waiver. The trial court reasoned:

\* \* \*

In sum, neither of [Ms. Luntz's] two lawyers in this case took any action concerning her motion to suppress prior to [December 27, 2019]. That date was more than ten weeks after the filing deadline had expired. As a matter of law and logic, this circumstance cannot constitute 'good cause' for relief from the Crim.R. 12(H) waiver. It is simply tautologous to argue that good cause for the relief from a waiver subsists in the very circumstance (i.e., the failure to take timely action) which generated the waiver in the first instance.

\* \* \*

[Ms. Luntz] sought no timely 'extension' under Crim.R. 12(D) for the filing deadline, before it expired. Thus, Crim.R. 12(D)'s "interest of justice" standard is inapplicable to the relief the [m]otion seeks. [Ms. Luntz] filed her first [motion for leave to file] more than ten weeks after the deadline expired. The [motion for leave] directs the [c]ourt to no law justifying the late-sought relief, under the circumstances presented. Under the applicable Crim.R. 12(H) standard, [Ms. Luntz] has failed to carry her burden to establish 'good cause' for either her failure to file a timely motion to suppress in this case, or her failure to take any action for the ten-week period following the filing deadline's expiration. [Ms. Luntz] has not justified relief from the waiver arising under Crim.R. 12(H), to which any defenses or objections she may have had are now [waived] as a matter of law.

\* \* \*

Thus, the matter moved forward in anticipation of trial.

### Motion *in Limine*

{¶8} On January 21, 2020, the State filed a motion *in limine* seeking to exclude the testimony of Dominique Garcia, Doctor of Optometry, regarding Ms. Luntz's eye conditions in

relation to nystagmus. According to the State's motion, Ms. Luntz scheduled an eye exam with Dr. Garcia "to see what effect, if any, [Ms. Luntz's] history of crossed eyes had on her DUI testing." The State indicated that, as a result of the eye exam, Dr. Garcia found Ms. Luntz's "right eye turns inward at times," known as monocular esotropia, and Ms. Luntz has "double vision when looking to the side," known as diplopia in lateral gazes. The State also indicated that Dr. Garcia noted "no nystagmus in both of Ms. Luntz's eyes." Upon speaking with Dr. Garcia, the State explained:

> Dr. Garcia indicated that only diplopia could look like nystagmus in some individuals during the lack of smooth pursuit portion of the HGN, not in the maximum deviation or onset prior to 45 degrees portion. Further, Dr. Garcia indicated that the HGN would not be affected by monocular esotropia, because during the HGN the officer is looking at the left eye when the right eye has converged towards the nose. Most importantly though, Dr. Garcia *did not see* nystagmus during any portion of [Ms. Luntz's] eye examination even with these conditions present.

(Emphasis added.) As such, the State urged the trial court to exclude Dr. Garcia's testimony, pursuant to Evid.R. 401, because it is not relevant to this matter. Additionally, if the trial court found Dr. Garcia's testimony "relevant," the State argued it should be excluded, pursuant to Evid.R. 403, because it "could only confuse the jury."

{¶9} In response, Ms. Luntz asserted Dr. Garcia's testimony is relevant and would not confuse the jury. In so doing, Ms. Luntz admitted that "Dr. Garcia did not note an actual nystagmus at the time of the examination," but Dr. Garcia did indicate that certain conditions "can cause other issues which may mimic the nystagmus[.]" According to Ms. Luntz, an issue known as "re-fixation [] can cause issues with the muscles that control the eye and can cause them to 'bounce[,]' thus potentially affecting the lack of smooth pursuit portion of the HGN." Ms. Luntz also argued that Dr. Garcia is not rendering an "expert opinion[,]" "but rather the

extent of [Dr. Garcia's] dealings with [Ms. Luntz] and the diagnosis she came to after her examination of [Ms. Luntz]."

{¶10}    The trial court, after extensive analysis, granted the State's motion *in limine* to exclude Dr. Garcia's testimony stating, in part:

* * *

*Dr. Garcia's testimony would, most generously construed, be relevant to only one issue in this case.*  That issue is whether nystagmus observed in [Ms. Luntz's] eyes during one of the three HGN subtests (i.e., the 'lack of smooth pursuit') on the day of her arrest was caused by her impairment or by diplopia.

* * *

Indeed, any connection between [Ms. Luntz's] nystagmus on the night of her arrest to the two conditions Dr. Garcia observed three months later *is at best indirect, remote, and implicit.*  Thus, even if technically relevant, and ignoring all of the expert witness aspects of Dr. Garcia's proposed testimony, the evidence in question *merits a fairly low estimation of its probative value concerning the facts of consequence.*

* * *

*Under these circumstances, the [c]ourt is persuaded that the risks of confusion of issues and of misleading the jury substantially outweigh the minimal probative value of the evidence.* Evid.R. 403(A).  The HGN test clues of impairment are only one aspect of the field sobriety tests.  The field sobriety tests are only one element of the evidence of [Ms. Luntz's] impairment.  [Ms. Luntz's] challenge to the 'lack of smooth pursuit' subtest results affects only one-third of that HGN test.  Against that, the jury will be presented with expert testimony, by a doctor no less.  That dynamic unavoidably conveys a testimonial weight that cannot but lend disproportionate emphasis to what is in fact a small [] portion of the State's case of impairment.  Indeed, limiting instructions themselves would likely convey to the jurors a concern with the very overweighting of that testimony which its introduction unavoidably risks.  *Given its relation to the overall case, its limited probative value, and the lack of proposed testimony specifically linking the diplopia observed on [November 11, 2019] to the nystagmus observed at [Ms. Luntz's] arrest on [September 7, 2019], Dr. Garcia's testimony ought not to be allowed into evidence.*

* * *

(Emphasis added.)

**The Trial**

{¶11} After several continuances, a jury trial commenced on October 14, 2020. The jury trial was limited to the OVI count against Ms. Luntz.[2] During its case-in-chief, the State called Officer Getto as its sole witness. After the State rested, Ms. Luntz called K.E., a former bartender at Rico's Bar & Grill, as the sole witness in her defense.

{¶12} Officer Getto testified on September 7, 2019, at 2:35 a.m., while "traveling westbound on Sleepy Hollow coming up to Pearl Road," he observed a Kia Soul, with no headlights on, pulling out from a parking lot behind a bar. The Kia Soul then pulled up behind Officer Getto's police cruiser at a red light at the intersection, "still with no headlights[.]" Officer Getto indicated he pulled into a BP gas station, turned around, and got behind the Kia Soul. As Officer Getto was making his turn, the driver of the Kia Soul turned on the headlights.

{¶13} When it was safe to do so, Officer Getto conducted a traffic stop and approached the driver's side of the vehicle. Officer Getto stated, "I made contact with the driver and only occupant of the vehicle, I introduced myself and then advised her the reason that I was stopping her." Officer Getto further stated that the driver, Ms. Luntz, "did state and acknowledge that she knew she was driving with her headlights off. [Ms. Luntz] stated she was just worried about a friend who was driving home drunk." Ms. Luntz's windshield wipers were also turned on even though it was not raining. At that point in time, Officer Getto also observed Ms. Luntz "had watery eyes[,]" "mumbled speech, hard to understand [] at times[,]" and "a strong odor of alcohol coming from that vehicle." Due to these observations, Officer Getto decided to perform standardized field sobriety tests, found in the National Highway Traffic Safety Administration

---

[2] A bench trial was held on October 15, 2020, as to the headlight violation.

("NHTSA") manual, on Ms. Luntz. Officer Getto noted when Ms. Luntz exited the vehicle, she "left the door open in the middle of the road," and he "had to shut it."

{¶14} In performing the HGN test, Officer Getto testified he first checked "for resting nystagmus[,]" or the involuntary jerking of the eye, and also checked for equal tracking and equal pupil size.[3] Importantly, Ms. Luntz did not have any of these issues. Officer Getto then proceeded with three subsets of the HGN test to look for six clues of impairment, three in the left eye and three in the right eye. Upon completing each of the three subsets of the HGN test, (i.e., lack of smooth pursuit, distinct and sustained nystagmus at maximum deviation, and onset of nystagmus prior to 45 degrees) Officer Getto observed six clues. Further, Officer Getto stated it was extremely difficult for Ms. Luntz to complete this test because he had to advise her several times "not to move her head[,]" and "had to tell her countless times to follow my finger."

{¶15} Next, in performing the walk-and-turn test, Officer Getto looked for eight different clues of impairment, such as: (1) starting the test before being instructed to do so; (2) not keeping their balance while in the starting position; (3) stepping off the line; (4) failing to make heel-to-toe steps; (5) making the incorrect number of steps; (6) raising their hands off their waist in order to balance; (7) making an incorrect turn; and (8) stopping the test before it is complete. Officer Getto observed that Ms. Luntz "wasn't making heel-to-toe steps, step[ped] off the line, incorrect turn." In addition, Officer Getto stated Ms. Luntz, "obviously stopped during the test before she was finished, couldn't keep her balance in the starting position, [and] started the test before [he] told her to do so."

---

[3] The Jury watched the body camera video of Ms. Luntz performing the standardized field sobriety tests and, during the video, heard Ms. Luntz indicate she was not drinking alcohol, but only had soda and water on the night in question.

{¶16} Finally, in performing the one-leg stand test, Officer Getto looked for clues of impairment based upon whether Ms. Luntz could lift either of her legs, approximately six inches off the ground, and "keep[] that foot parallel to the ground." Officer Getto explained a person is instructed to keep their "eye on the toe that is raised at all times with both legs straight and to count in the manner of one-thousand-one one-thousand two, one-thousand-three until I tell them to stop." According to Officer Getto, an unimpaired person can typically balance for thirty-seconds. Prior to beginning this test, Ms. Luntz informed Officer Getto of a "right ankle injury," so he gave her the option of using her left leg instead. Ms. Luntz balanced on her left leg for only six seconds and was then placed under arrest.

{¶17} At the Brunswick Hills Police Department, Ms. Luntz was asked whether she would submit to a breathalyzer test. Officer Getto explained to Ms. Luntz if she either refused the breathalyzer test or tested over the legal limit, her driver's license would automatically be suspended for 90 days because she had no prior offenses. However, if Ms. Luntz submitted to the breathalyzer test and tested under the legal limit, Officer Getto "would just have given her a warning for the headlight violation." Officer Getto further testified that, while performing the standardized field sobriety tests and at the Brunswick Hills Police Department, he continued smelling an odor of alcohol coming from Ms. Luntz's "breath" and "person[.]" Although Ms. Luntz repeatedly maintained she consumed no alcoholic beverages, but, instead drank soda and water, she ultimately refused to submit to the breathalyzer test.[4] Based upon the totality of the

---

[4] During cross-examination, the jury heard Officer Getto admit that the police report only indicated he observed a strong odor of alcohol coming from Ms. Luntz's vehicle but did not indicate he also observed a strong odor of alcohol from her breath or person.

circumstances of the traffic stop, Officer Getto concluded Ms. Luntz, "was absolutely under the influence of alcohol."

{¶18} K.E. testified that, prior to moving to Wisconsin, she was employed as a bartender at Rico's Bar & Grill for six months and Ms. Luntz was an occasional customer. Further, K.E. recalled, on the night of September 7, 2019, she was the only bartender at Rico's Bar & Grill and served Ms. Luntz "water with lemon." K.E. indicated, "[t]hat's the only thing I've ever served [Ms. Luntz] is water." However, on cross-examination, K.E. admitted she may have served Ms. Luntz "soda water[,]" but not on September 7, 2019. Also, K.E. testified, on September 7, 2019, Ms. Luntz came into Rico's Bar & Grill alone before 9 p.m. and left "[a]fter midnight." K.E. stated that, while at the bar, Ms. Luntz was talking with three or four people, including a woman named "Mary" in her 40's, a business owner named "Mark" out of Brunswick, and a father and daughter who were only there for a brief period of time.

{¶19} After the completion of the K.E.'s testimony, the State re-called Officer Getto as a rebuttal witness. Officer Getto testified that, at the traffic stop, Ms. Luntz told him she was at Rico's Bar & Grill to console one of her son's co-workers, a person twenty-seven years of age. Further, Officer Getto reiterated that Ms. Luntz maintained she was drinking "water" and "soda."

{¶20} Upon hearing the testimony of Officer Getto and K.E. and reviewing the video footage of Ms. Luntz's traffic stop and the other evidence presented at trial, the jury returned a guilty verdict on the OVI count. Further, at the bench trial, the trial court found Ms. Luntz guilty of the headlight violation. After a presentence investigation, the trial court sentenced Ms. Luntz to pay a $500 fine for the OVI violation, a $50 fine for the headlight violation, and further sentenced Ms. Luntz to three days in jail, with three days of credit given for attending a 72-hour DUI program. The trial court also suspended Ms. Luntz's driver's license for nine months

beginning September 7, 2019, which had already come to pass as of the date of Ms. Luntz's sentencing hearing and assessed six points against Ms. Luntz's driver's license.[5]

{¶21} Ms. Luntz appealed, raising six assignments of error for our review. This Court has grouped certain assignments of error in order to better facilitate our analysis.

II.

**ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO RECONSIDER THE TRIAL COURT'S PROPER DECISION THAT GRANTED LEAVE TO PLEAD ALLOWING THE FILING OF [MS. LUNTZ'S] MOTION TO SUPPRESS WHEN [MS. LUNTZ] PROPERLY PLEAD REASONS FOR A DELAYED FILING.**

{¶22} In her first assignment of error, Ms. Luntz argues the trial court abused its discretion in denying her leave to file an untimely motion to suppress. We disagree.

{¶23} "A motion to suppress must be filed within thirty-five days after arraignment unless a trial court extends that time period in the interest of justice or grants relief from it for good cause shown." *State v. Jenny*, 9th Dist. Medina No. 18CA0041-M, 2019-Ohio-1491, ¶ 7, quoting *State v. Woodson*, 9th Dist. Wayne No. 07CA0044, 2008-Ohio-1469, ¶ 10, citing Crim.R. 12(D), (H). It is the defendant's burden to "demonstrat[e] 'good cause' to excuse the late filing." *In re McCall*, 9th Dist. Summit No. 20455, 2001 WL 755127, *2 (July 5, 2001). "This Court will not reverse a trial court's decision denying leave to file an untimely motion to suppress absent an abuse of discretion." *State v. Lisle*, 9th Dist. Wayne No. 05CA0073, 2006-Ohio-3877, ¶ 12. An abuse of discretion indicates that the trial court was unreasonable,

---

[5] As of the date of sentencing, Ms. Luntz's driver's license had already been fully reinstated because over one-year had passed from the date of Ms. Luntz's arrest.

arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶24} As indicated previously, the record supports that Ms. Luntz failed to: (1) properly serve the State with her motion after the State indicated to Ms. Luntz's counsel it would object to such a motion if filed; and (2) show "good cause" for the untimely filing of the motions for leave and to suppress. In its detailed judgment entry, the trial court stated, in relevant part:

> First, the [December 30, 2019] [j]udgment [e]ntry was improperly entered because [Ms. Luntz] failed to properly serve the State with the [m]otion [f]or [l]eave. The [c]ertificate of [s]ervice attached to [the motion] states that [Ms. Luntz] served that motion "by U.S. Mail upon the following," and then identifies the "Brunswick Hills Prosecuting Attorney" and a fax number, i.e., "330-220-1348." No address is listed on the [c]ertificate of [s]ervice concerning the purported mail service. And the State's fax number on the [c]ertificate of [s]ervice [] is incorrect. Documents filed by the State in this case reflect its office's physical address as 132 N. Elmwood Avenue, P.O. Box 703, Medina, Ohio 44258, and its fax number as (330) 723-3508. None of that correct information appeared on the [m]otion for [l]eave's [c]ertificate of [s]ervice.
>
> These multiple defects [], and the failure of actual contemporaneous service of that [m]otion on the State [] precluded the [a]cting [j]udge's disposing of the [m]otion for [l]eave on [December 30, 2019[.][6]

Moreover, as to Ms. Luntz's failure to show "good cause," the trial court indicated: (1) Ms. Luntz never moved for a filing extension before the thirty-five-day time limit expired; (2) Ms. Luntz failed to take any action for the ten-week period following the filing deadline's expiration; and (3) Ms. Luntz further failed to explain any actual reasons, in her motion for leave, for the untimely filing. Thus, in denying Ms. Luntz's motion for leave, the trial court concluded:

---

[6] Pursuant to Crim.R. 49(A) and (C), applicable through Traf.R. 20, "[w]ritten notices, requests for discovery, designation of record on appeal, written motions other than those heard ex parte, and similar papers, *shall be served* upon each of the parties. * * * Papers filed with the court shall not be considered until proof of service is endorsed thereon or separately filed." (Emphasis added.)

[T]he [c]ourt is required to seek the "fair, impartial, speedy and sure administration of justice * * * ." Crim.R. 1(B). It disserves each of these fourfold considerations if, in the exercise of discretion to relieve a party from the Rules' plain terms, obvious non-compliance or dilatory compliance is generally accorded the same regard as good faith, diligent, proactive compliance.

{¶25} The record, here, clearly reveals a lack of proper service upon the State and a failure to show "good cause" as to why the motions for leave and to suppress were untimely filed. Therefore, based upon this record, we cannot say the trial court abused its discretion in reconsidering Ms. Luntz's motion for leave to plead and ultimately denying it. *See Jenny* at ¶ 12.

{¶26} Accordingly, Ms. Luntz's first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

**[MS. LUNTZ] WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HER INTITIAL [COUNSEL] FAILED TO TIMELY FILE A MOTION TO SUPPRESS PURSUANT TO CRIM. R. 12 WHEN LEGITIMATE SUPPRESSION ISSUES EXISTED.**

{¶27} In her second assignment of error, Ms. Luntz argues she was denied the effective assistance of counsel when her initial attorney failed to timely file a motion to suppress the traffic stop. This Court, however, is not persuaded by Ms. Luntz's argument.

{¶28} "To prevail on a claim of ineffective assistance of counsel, [Ms. Luntz] must show: (1) that counsel's performance was deficient to the extent that 'counsel was not functioning as the 'counsel' guaranteed [Ms. Luntz] by the Sixth Amendment' and (2) that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different." *State v. Grad*, 9th Dist. Medina No. 15CA0014-M, 2016-Ohio-8388, ¶ 6, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). "A deficient performance is one that falls below an objective standard of reasonable representation." *Id.* at ¶ 6, citing *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. However, this Court, "must indulge a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at ¶ 6, citing *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 100 (1955). Additionally, in order to establish prejudice, Ms. Luntz "must show that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.*at ¶ 6, citing *Strickland* at 694.

{¶29} Indeed, "[f]ailing to file a motion to suppress does not constitute ineffective assistance of counsel per se." *State v. Double*, 9th Dist. Medina No. 20CA0021-M, 2021-Ohio-632, ¶ 28, quoting *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, ¶ 65. As this Court has previously stated, "[c]ounsel's decision not to file a motion to suppress may be a matter of trial strategy, including counsel's reasonable assessment of whether such a motion is likely to succeed and recognition that filing a motion to suppress has risks." *Id.* at ¶ 28, quoting *State v. Kendall*, 9th Dist. Summit No. 25721, 2012-Ohio-1172, ¶ 7. "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *Id.* at ¶ 28, quoting *Brown* at ¶ 65. "Furthermore, in order to satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate that there was a reasonable probability that the motion to suppress would have been granted." *Id.* at ¶ 28, citing *Kendall* at ¶ 7.

{¶30} "It is well-established that a police officer who observes a traffic violation possesses reasonable suspicion to conduct an investigatory stop." *Double* at ¶ 29, quoting *State v. Jackson*, 9th Dist. Lorain No. 14CA010555, 2015-Ohio-2473, ¶ 15. Further, "[t]he question of whether an insubstantial or minor violation of a traffic law will give rise to a reasonable suspicion to make an investigatory stop was resolved when the United States Supreme Court and

the Ohio Supreme Court both held that *any* violation of a traffic law gives rise to a reasonable suspicion to make an investigatory stop of a vehicle." *State v. Johnson*, 9th Dist. Medina No. No. 03CA0127-M, 2004-Ohio-3409, ¶ 11.

{¶31} In the present matter, the record indicates that Officer Getto saw Ms. Luntz exit the parking lot behind Rico's Bar & Grill, at 2:35 a.m., onto a dark road, without turning on her headlights in violation of R.C. 4513.03(A). Officer Getto then initiated a traffic stop, and upon having contact with Ms. Luntz, observed a strong odor of alcohol coming from the vehicle where Ms. Luntz was the sole occupant. Officer Getto further detained Ms. Luntz in order to perform standardized field sobriety tests, and based upon numerous clues of impairment, Ms. Luntz was placed under arrest for OVI. In light of this record, we conclude Ms. Luntz has failed to demonstrate there was a basis to suppress the evidence in question and has also failed to demonstrate there was a reasonable probability that the motion to suppress would have been granted. Therefore, Ms. Luntz has failed to establish that her trial counsel rendered ineffective assistance by not filing a motion to suppress relative to the traffic stop and subsequent field sobriety tests. *See Double* at ¶ 30.

{¶32} Accordingly, Ms. Luntz's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

**THE TRIAL COURT ERRED WHEN IT RULED THAT [MS. LUNTZ'S] TREATING PHYSICIAN COULD NOT TESTIFY AS TO [MS. LUNTZ'S] [] MATERIAL [] CONDITION THAT THE PHYSICIAN PERSONALLY OBSERVED.**

{¶33} In her third assignment of error, Ms. Luntz argues the trial court erred in its ruling *in limine* to exclude the testimony of Dr. Garcia related to Ms. Luntz's eye conditions that could possibly mimic nystagmus. For the reasons that follow, we disagree.

{¶34} "Evid.R. 701 * * * allows lay witnesses to provide an opinion when that opinion is: '(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" *State v. Heller*, 9th Dist. Lorain No. 18CA011304, 2019-Ohio-4722, ¶ 7. Moreover, "courts have used Evid.R. 701 to permit treating physicians to render opinions based upon their personal observations and perceptions." *Id.* quoting *Williams v. Reynolds Rd. Surgical Ctr., Ltd.*, 6th Dist. Lucas No. L-02-1144, 2004-Ohio-1645, ¶ 3. Additionally, Evid.R. 403(A) states that, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Thus, "Evid.R. 403 requires a court to weigh the probative value of the evidence against the danger of unfair prejudice, confusion of the issues, or misleading the jury and to exclude evidence more prejudicial then probative." *Eckmeyer v. McNealis*, 9th Dist. Summit No. 27707, 2016-Ohio-7276, ¶ 11, citing *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 87.

{¶35} This Court reviews a trial court's decision pertaining to the admission of evidence under Evid.R. 701 and Evid. R. 403 for an abuse of discretion. *Heller* at ¶ 7, citing *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113 (1989); *Eckmeyer* at ¶ 10. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶36} Here, as indicated above, the trial court granted the State's motion *in limine* to exclude Dr. Garcia's testimony at trial. In so doing, the trial court explained that, although minimally relevant, the probative value of Dr. Garcia's testimony regarding Ms. Luntz's eye conditions did not outweigh the danger of unfair prejudice, and would confuse the jury, because only one of the two eye conditions could potentially mimic nystagmus in one of the three subsets

of the HGN test. Further, the record reflects that Dr. Garcia *did not note any nystagmus* during Ms. Luntz's examination. Although the State argues that Ms. Luntz forfeited this issue on appeal because she failed to proffer Dr. Garcia's testimony at trial, Evid.R. 103(A), as amended, now states:

> (2) *Offer of Proof.* In case the ruling is one excluding evidence, *the substance of the evidence was made known to the court* by offer *or was apparent from the context within which questions were asked.*
>
> * * *
>
> Once the court rules definitely on the record, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

 (Emphasis added.) Based upon the State's motion *in limine* and Ms. Luntz's opposition, the trial court stated the following:

> [b]ut the parties do agree on one essential point. Dr. Garcia's testimony would, most generously construed, be relevant to only one issue in this case. That issue is whether nystagmus observed in [Ms. Luntz's] eyes during one of the three HGN subtests (i.e.. the "lack of smooth pursuit") on the day of her arrest was caused by her impairment or by diplopia. The parties further agree that Dr. Garcia would testify that the two optometric conditions with which she diagnosed [Ms. Luntz] have no bearing on her performance of the other two HGN subtests.

 Because the substance of Dr. Garcia's testimony was apparent to the trial court, this issue has not been forfeited on appeal. Therefore, based upon this record, we cannot conclude the trial court abused its discretion in excluding Dr. Garcia's testimony based upon Evid.R. 701 and Evid.R. 403(A). *See Wade v. Mancuso*, 9th Dist. Lorain No. 16CA010978, 2018-Ohio-1563, ¶ 41.

{¶37} Accordingly, Ms. Luntz's third assignment of error is overruled.

**ASSIGNMENT OF ERROR IV**

**THE STATE OF OHIO VIOLATED [MS. LUNTZ'S] RIGHT TO A FAIR TRIAL BY COMMENTS MADE DURING OPENING STATEMENT AND CLOSING ARGUMENT IN VIOLATION OF THE FIFTH AND SIXTH**

**AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS OHIO'S CONSTITUTION.**

**ASSIGNMENT OF ERROR V**

**THE TRIAL COURT ERRED BY ALLOWING THE STATE OF OHIO TO COMMENT UPON [MS. LUNTZ'S] SILENCE FOLLOWING HER ARREST AS EVIDENCE OF HER GUILT IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS OHIO'S CONSTITUTION.**

{¶38} In her fourth and fifth assignments of error, Ms. Luntz argues the State violated her right to a fair trial due to comments made during opening statement and closing arguments regarding her refusal to submit to a breathalyzer test on September 7, 2019. For the reasons that follow, Ms. Luntz's assignments of error are not well-taken.

{¶39} Notably, the record demonstrates that Ms. Luntz's counsel only objected a total of three times during the entirety of the jury trial; once during the direct examination of Officer Getto and twice during the rebuttal portion of the State's closing argument. During its rebuttal, the State made specific comments in response to Ms. Luntz's counsel's statement during closing argument: "[Ms. Luntz] is not required to give a breath test. And at this point why would she? The officer hasn't believed her." The relevant prosecutorial comments, as well as Ms. Luntz's objections, are as follows:

\* \* \*

[The State]: Attorney Carro asked well, why would [Ms. Luntz] take that breath test? Well, I'll tell you what. You take that breath test because she's saying I haven't been drinking and there's a police officer saying, man, you smell like you've been drinking. And she didn't say anything at the time well, it's from the bar or anything else. Okay. That developed later on, but here we are.

*We've got I really think that odor is coming from your breath and she's like, no, no, no, I haven't been drinking. What's the best way to determine who's right and who's wrong? Blow in the [breath] test.*

[Defense Counsel]: Objection, your Honor.

* * *

[The State]:  Look.  If somebody goes out to dinner, right, and they have a glass of wine at dinner and on the way home they get pulled over by a police officer and the police officer says, hey, I can smell alcohol on you.  Do some tests, I think you may be impaired, I want you to take a breath test.  All right.

Now, that person goes back to the police station says, I had that glass of wine, you know, I don't know if I blow into this test whether it's going to say .2 or .4 or .8 or .10 or what it might say.  I just don't know because I've had alcohol.  I'm reasonably concerned about taking a breath test of my amount of alcohol because I don't know where it's going to fall on that range, right?  That's reasonable.

*But if someone's insisting to the point of this that they did not have any alcohol at all where's the fear of taking the test?  Okay.  Well, a glass of wine might register .04 and .06 and we don't know, right? but no alcohol can only register one result .00.  That's what no alcohol is .00.*

[Defense Counsel]:  Objection, you Honor.

(Emphasis added.)  The trial court did not rule upon these objections on the record but a sidebar discussion between the trial court and counsel was held after each objection.

{¶40}  "Statements refusing to take the breath and/or urine tests are not protected by the privilege against self-incrimination and, thus, are admissible."  *State v. Rollyson,* 20 Ohio App.3d 336, 337 (9th Dist.1984), citing *South Dakota v. Neville*, 459 U.S. 553 (1983).  Further, the Supreme Court of Ohio has explained:

Where a defendant is being accused of intoxication and is not intoxicated, the taking of a reasonably reliable chemical test for intoxication should establish that [she] is not intoxicated. On the other hand, if [she] is intoxicated, the taking of such a test will probably establish that [she] is intoxicated. Thus, if [she] is not intoxicated, such a test will provide evidence for [her]; but, if [she] is intoxicated, the test will provide evidence against [her]. Thus, it is reasonable to infer that a refusal to take such a test indicates the defendant's fear of the results of the test and [her] consciousness of guilt, especially where [she] is asked his reason for such refusal and [she] gives no reason which would indicate that [her] refusal had no relation to such consciousness of guilt.

*Maumee v. Anistik*, 69 Ohio St.3d 339, 343 (1994), quoting *City of Westerville v. Cunningham*, 15 Ohio St.2d 121, 122 (1968). Thus, with the above-stated reasoning in mind, the Supreme Court of Ohio approved the following jury instruction, stating:

> Evidence has been introduced indicating the defendant was asked but refused to submit to a chemical test of his [or her] breath to determine the amount of alcohol in his [or her] system, for the purpose of suggesting that the defendant believed he [or she] was under the influence of alcohol. If you find the defendant refused to submit to said test, you may, but are not required to, consider this evidence along with all the other facts and circumstances in evidence in deciding whether the defendant was under the influence of alcohol.

*Maumee* at 344.

{¶41} Here, the record reveals that on September 7, 2019, Ms. Luntz maintained she had no alcoholic beverages to drink, but instead had water and soda at Rico's Bar & Grill. However, when asked to submit to a breathalyzer test, Ms. Luntz refused. During opening and closing arguments, the State argued Ms. Luntz's refusal to submit to the breathalyzer test demonstrated she was aware the result would have registered over the legal limit and would have confirmed Officer Getto's observations that Ms. Luntz was under the influence of alcohol. The State's comments, however, stemmed from Ms. Luntz's own insistence that she consumed no alcohol, and did not offend Ms. Luntz's right against self-incrimination. Moreover, the record reveals Ms. Luntz did not object to the identical jury instruction, as set forth in *Maumee* at 344, which allowed the jury to consider Ms. Luntz's refusal to submit to a breathalyzer test for the purpose of suggesting Ms. Luntz believed she was under the influence of alcohol. As such, the State did not violate Ms. Luntz's right to a fair trial.

{¶42} Further, in its jury instructions, the trial court advised:

* * *

> The evidence does not include the complaint or the opening statements or the closing arguments of counsel. The opening statements and closing arguments of counsel are designed to assist you and are not evidence.
>
> * * *
>
> You are the sole judges of the facts, the credibility of the witnesses and the weight of the evidence. To weigh the evidence you must consider the credibility of all the witnesses who testified. You will apply the test of truthfulness which you apply in your daily lives.
>
> * * *

Indeed, "in the tension and turmoil of a trial, both the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott*, 51 Ohio St.3d 160, 165, quoting *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970). Although this Court does not condone the State's use of hypotheticals and hyperbole during closing argument, the State's comments were in response to Ms. Luntz's counsel's query regarding why Ms. Luntz should take the breathalyzer test and did not violate her right to remain silent or right to a fair trial. Further, the trial court instructed the jury that opening statements and closing arguments are not evidence and only the jury can determine the credibility of witnesses. "The instruction was clear, and we can assume that the jury followed the trial court's instructions." *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, ¶ 87.

{¶43} Accordingly, Ms. Luntz's fourth and fifth assignments of error are overruled.

### ASSIGNMENT OF ERROR VI

**[MS. LUNTZ'S] CONVICTION IS AGAINST THE [MANIFEST] WEIGHT OF THE EVIDENCE.**

{¶44} In her sixth assignment of error, Ms. Luntz argues her conviction is against the manifest weight of the evidence. This Court disagrees.

{¶45} "[W]hen considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, 'weigh the evidence and all reasonable inferences,

consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Perkins*, 9th Dist. Wayne No. 20AP0031, 2021-Ohio-2630, ¶ 11, quoting *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 9th Dist. Summit No. 29290, 2019-Ohio-3970, ¶ 26.

{¶46} Here, the jury heard Officer Getto testify that: (1) at 2:35 a.m., Ms. Luntz exited a parking lot behind Rico's Bar & Grill, onto a dark road, without using her headlights; (2) he could smell a strong odor of alcohol coming from Ms. Luntz's vehicle where Ms. Luntz was the sole occupant, and later could smell alcohol on Ms. Luntz's breath and person; (3) Ms. Luntz had her windshield wipers on and it was not raining; (4) Ms. Luntz had watery eyes and mumbled speech; (5) Ms. Luntz left the car door open when she exited the vehicle; (6) Ms. Luntz continually maintained she had no alcohol to drink but refused to submit to the breathalyzer test; and (7) Ms. Luntz exhibited several clues of impairment based upon her performance of the standardized field sobriety tests. The jury was also privy to Ms. Luntz's cross-examination of Officer Getto. During cross examination, the jury heard Officer Getto testify as to certain gaps in the police report regarding his observation of a strong odor of alcohol coming from Ms. Luntz's breath and person. Additionally, Officer Getto admitted his hand was on Ms. Luntz's car door because he "helped her open the door" and, as such, Ms. Luntz could have assumed Officer Getto was also going to close the car door. Officer Getto was also thoroughly questioned on the instructions he gave in administering the standardized field sobriety tests. Further, the jury reviewed the video footage, with audio, of Ms. Luntz performing the standardized field

sobriety tests and also heard testimony from K.E., that conflicted with Officer Getto's testimony, regarding who Ms. Luntz was socializing with at Rico's Bar & Grill and what Ms. Luntz allegedly had to drink that evening.

{¶47} Based upon this record, however, we cannot say the jury clearly lost its way in resolving the conflicting testimony between Officer Getto and K.E. to create such a manifest miscarriage of justice that Ms. Luntz's conviction must be reversed and a new trial ordered or that this is the exceptional case in which the evidence weighs heavily against the conviction.

{¶48} Accordingly, Ms. Luntz's sixth assignment of error is overruled.

III.

{¶49} For the foregoing reasons, Ms. Luntz's six assignments of error are overruled. The judgment of the Medina Municipal Court is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Medina Municipal Court, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETTY SUTTON
FOR THE COURT

TEODOSIO, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JOSEPH C. PATITUCE, Attorney at Law, for Appellant.

ROBERT B. CAMPBELL, Prosecuting Attorney, for Appellee.